UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| PAULETTE DAVIS,<br><br>                Plaintiff,<br><br>v.<br><br>THE MONEY SOURCE INC. and<br>SERVICELINK FIELD SERVICES, LLC,<br><br>                Defendants. | Case No. 3:21-cv-47<br><br>January 13, 2021<br><br><br>**JURY TRIAL DEMANDED** |

# COMPLAINT

1. Paulette Davis brings this action against her mortgage company The Money Source Inc. and its cohort, ServiceLink Field Services, LLC.

2. The Money Source says it "believe[s] in Pink Unicorns."

3. The Money Source says it is a "different kind of company."

4. The Money Source says it provides its customers "with a little bit of Joydom. No, a lot of Joydom."

5. The Money Source says it "speak[s] a different language."

6. By working with ServiceLink to send strangers to Ms. Davis's home to call her a particularly heinous racial slur and tell her she is more likely to be stealing copper from her house than residing in it, The Money Source has shown what "different language" it speaks and what "a lot of Joydom" means.

7. By flagrantly disregarding its obligations under federal and state law, including the CARES Act, the Real Estate Settlement Procedures Act and the Fair Housing Act, The Money Source has shown what being a "different kind of company" means.

## PARTIES

8. Paulette Davis is an individual who resides at 45 Maybrook Rd., Waterbury, CT 06708. She is a Black woman in her 50s who grew up in Jamaica and has lived in Connecticut since 1999. She became a United States citizen in 2015.

9. The Money Source Inc. ("TMS") is a corporation with significant operations at 500 South Broad St., Ste. 100A, Meriden, CT 06450, an agent of service of CT Corporation System, 67 Burnside Avenue, East Hartford, CT 06108, and headquarters at 3138 E. Elwood St., Phoenix, AZ 85034.

10. ServiceLink Field Services, LLC ("SLFS") is a limited liability company with its principal place of business at 601 Riverside Ave., Jacksonville, FL 32204.

11. At all times relevant to this Complaint, TMS owned and serviced Ms. Davis's FHA-backed mortgage on her home, and SLFS performed property inspection on behalf of TMS, as TMS's agent, on Ms. Davis's home.

## JURISDICTION AND VENUE

12. This Court has jurisdiction over the federal claims under 42 U.S.C. § 3613 and 12 U.S.C. § 2605 and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

13. Venue is proper in this District under 28 U.S.C. § 1391(b) as a substantial part of the events or omissions giving rise to the claims asserted herein occurred in the District of Connecticut.

## SUMMARY OF CLAIMS

14. Ms. Davis's claims against the defendants arise under the Fair Housing Act, federal Real Estate Settlement Procedures Act ("RESPA"), the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a, *et seq*. ("CUTPA"), and state common law. The claims provide for actual damages, statutory damages, punitive damages, costs, and attorneys' fees.

## FACTS

15. In late 2017 Ms. Davis was living in Bridgeport, CT but wanted to live closer to her then-job in Washington, CT. After a bit of a search, she decided to purchase a home in Waterbury, CT.

16. In December, 2017, on the morning of the day she closed on her home, she was laid off from the job she held at the time. Ms. Davis felt stuck between a rock and a hard place because she risked losing her more than $5,000 deposit if she didn't close. Knowing she had a great track record of employment, she decided to go forward with the house purchase.

17. Unfortunately, Ms. Davis faced troubles with her income beyond the initial layoff. In particular, she has had issues with consistent and her husband abandoned her, leading to the annulment of their mortgage in 2019.

18. She has stayed in communication with TMS throughout this time regarding her desire to keep her home, her residence and occupancy of the home, and her desire to obtain a loan workout.

19. At one point when Ms. Davis disclosed she was attending nursing school to improve her career and income opportunities, TMS told her to quit school so she could pick up more work hours; she did so.

20. To try to keep her home Ms. Davis has worked as a housekeeper in Greenwich and for Companions and Homemakers on behalf of an Alzheimer's patient, has taken in an international student, and agreed with the State to provide in-home care – in her home – to an elderly individual. She has done all of this to try to keep her home.

21. Despite all her efforts, Ms. Davis lives in fear that someone will come to her home and force her to leave because of her difficulties paying the mortgage.

TMS and SLFS Work Together to Harass and Insult Ms. Davis at Her Home.

22. Shortly after Ms. Davis fell behind on her mortgage, TMS directed SLFS to send strangers to enter and inspect her property on its behalf.

23. As part of this arrangement, TMS paid SLFS a certain agreed-upon amount of money per task and then charged Ms. Davis for the amount it paid to SLFS. SLFS earned revenue each time it entered Ms. Davis's property.

24. TMS provided SLFS with an extensive set of requirements and information under which SLFS was obligated to complete its "field services" work on behalf of TMS, including strict deadlines, hiring requirements, communications with TMS and TMS's customers, and access to TMS's customers' confidential information. In doing so, TMS controlled the work done by SLFS.

25. In turn, SLFS hired individuals and/or companies to perform the "field services" TMS had instructed SLFS to perform. SLFS controlled the work of these individuals and/or companies by subjecting them to the same requirements and providing them with detailed instructions that included strict deadlines and an extensive set of requirements regarding the manner by which the work was to be done and documented. SLFS also provided these

individuals and companies with confidential information regarding TMS's customers. In doing all of this, SLFS controlled the work done by the strangers it sent to Ms. Davis's home.

26. TMS had an explicit duty to supervise SLFS based on a bulletin issued by its regulator, the federal Consumer Financial Protection Bureau (CFPB), on October 31, 2016 regarding mortgage servicers' use of "service providers" like SLFS. This bulletin obligates TMS to engage in supervision that includes:

   a. Conducting thorough due diligence to verify that the service provider understands and is capable of complying with Federal consumer financial law;

   b. Requesting and reviewing the service provider's policies, procedures, internal controls, and training materials to ensure that the service provider conducts appropriate training and oversight of employees or agents that have consumer contact or compliance responsibilities;

   c. Including in the contract with the service provider clear expectations about compliance, as well as appropriate and enforceable consequences for violating any compliance-related responsibilities, including engaging in unfair, deceptive, or abusive acts or practices;

   d. Establishing internal controls and on-going monitoring to determine whether the service provider is complying with Federal consumer financial law; and

   e. Taking prompt action to address fully any problems identified through the monitoring process, including terminating the relationship where appropriate.

27. Ms. Davis lives on a dead-end street in a quiet, residential neighborhood that borders a golf course. There is very little traffic down her street; any car that does not belong to a neighbor stands out. Hers is one of only two households of color in the area.

28. One day in early 2019, she was home alone, in her kitchen. To her surprise she saw a young man walking around outside, close to her home. She rapped on her windows and

shouted "you shouldn't be doing that." The man heard her and scurried away. She asked her neighbors if they knew who he was; they did not.

29. A month or two thereafter, she was home alone again when she saw a man peering inside through her living room's French doors. She walked outside and asked him what he was doing on her property. He grew annoyed and told her "I don't know why you're here. Go back to Bridgeport. I don't know where all you n----rs are coming from. This is not your house." He told her the house belonged to the mortgage company, not her.

30. He also pointed to a "No Trespassing" sign that was just beyond her fence, on the golf course of the neighboring country club. He told her that this was the only spot in the neighborhood where there was such a sign, and that it was there because the country club was concerned that she and her family would try to rob the club's golfers. He then walked away, towards his car. But before he left, he tried to forcibly open her garage door. In doing so, he broke it, forcing Ms. Davis to figure out a way to keep it wedged shut.

31. Ms. Davis is forced to remember this interaction each time she deals with her broken garage door, and each time she sees the sign on the other side of her fence.

32. This stranger who directed the slur at Ms. Davis was White, in his 50s, and about 5'7", 160 lbs.

33. Based on these interactions Ms. Davis determined that TMS had sent these strangers. She called TMS to complain and referenced the racial nature of the most recent stranger's comments. TMS confirmed that it was sending strangers to the property, and that it had to send them because she was behind on her mortgage. It refused to do anything differently.

34. A couple months later Ms. Davis came across yet another stranger on her property. When she confronted him, she asked if he intended to do damage to her property like

6

the last stranger had. He said that he didn't blame the prior stranger because that stranger may have thought she was at the property stealing copper rather than living there, given the neighborhood and her complexion. He then left soon thereafter.

35.     Upon information and belief, TMS and SLFS continue to send these two strangers from the immediately preceding paragraphs to inspect other customers' homes, including other customers who are Black. Furthermore, TMS and SLFS took no action to reprimand, discipline, or otherwise alter their relationship with their agents even though Ms. Davis alerted TMS to the racial nature of her comments and TMS and SLFS worked together to send those agents to her property. Furthermore, TMS and SLFS took no action to investigate Ms. Davis's complaint.

36.     It was around now where Ms. Davis determined that the strangers would normally appear in the first part of the month for these inspections. They were usually men, though three were women, and all or almost all of them were white.

37.     Ms. Davis contacted TMS many times to complain about these intrusions. She explained she was worried about people looking through her windows, scaring her underaged grandson. She offered to set up regular appointments for the inspections; if they really were required, she was happy to oblige rather than be startled each time a stranger invited themselves onto the property. TMS refused to take Ms. Davis on her offer, and were generally dismissive of what it and SLFS were doing to her. Moreover, each time she called, TMS confirmed that the strangers were at her house at its behalf.

38.     Many times the strangers would ignore Ms. Davis, even if she were outside. She wondered if they ignored her because they assumed that, as a Black woman, she was part of the help rather than the homeowner. She wondered what she had done to be treated less than human.

39. Ms. Davis would have to confront these strangers in order for them to acknowledge her presence. They would often be resentful; one even gave her the middle finger.

40. These intrusions continue to this day, every month, even though Ms. Davis lodges regular calls and complaints to TMS.

41. In or around February 2020, Ms. Davis told TMS she would call the police on any future intruder. TMS told her that such a call would only lead to her being arrested.

42. On or about June 1, 2020, Ms. Davis found another one of these strangers at her home. This stranger drove up to her property and pointed something at her that looked like a gun. Although the object turned out to be a camera, Ms. Davis was terrified. The stranger was yet another inspector from the TMS/SLFS team. He yelled "property inspection" and sped away after frightening Ms. Davis.

43. TMS continues sending strangers to Ms. Davis's home every month, via SLFS, notwithstanding her continued communications with TMS regarding her desire to obtain a loan workout so that she can keep her home.

44. Ms. Davis no longer feels safe at her own home because of what TMS and SLFS have done. She lives in constant fear of having to confront another stranger at her home and worries the consequences will be more than a broken garage door.

45. She has told family, including her brothers and daughter, and some of her friends about her experiences. She relies on them to draw the strength she needs just to live in her home without the peace and quiet to which she is entitled.

46. Upon information and belief, TMS and SLFS's handling of Ms. Davis's complaint was consistent with how they handle complaints relating to property inspection, property preservation, and discrimination from homeowners.

47.     Either (a) TMS and SLFS have policies and procedures for performing property inspection services that are inadequate to protect TMS borrowers, or (b) TMS and SLFS failed to follow their policies and procedures when dealing with Ms. Davis.

TMS Ignores Its Requirements Under the CARES Act

48.     On March 27, 2020, President Trump signed the Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, a/k/a the CARES Act, into law.

49.     The CARES Act required mortgage servicers of "federally-backed" loans to provide homeowners with a forbearance – a pause on foreclosure, fees, and payment requirements – for up to 360 days upon request, irrespective of the loan's default status.

50.     Because her loan is insured by the Federal Housing Administration, Ms. Davis has a "federally-backed" loan for purposes of the CARES Act and is therefore eligible to receive a forbearance.

51.     The FHA has specifically instructed servicers of FHA-insured loans, like TMS, that they must provide forbearances of up to 180 days, and then a subsequent forbearance of up to 180 days upon borrower request.

52.     During a forbearance period, servicers charge fewer fees to their borrowers' accounts than they normally would during a period in which the borrower is not making mortgage payments.

53.     The FHA has further instructed servicers of FHA-insured loans, like TMS, that they may not require borrowers to make up all missed payments at once at the end of a forbearance period.

54. Ms. Davis has repeatedly requested a forbearance pursuant to the CARES Act over the phone and in writing from TMS in 2020. TMS has refused to provide her with a forbearance each time.

55. Furthermore, on June 25, 2020, a TMS employee named Brian and another named Oziah [phonetic] told her that, even if she received a forbearance, she would have to make up any missed payments via a lump sum at the end of the forbearance period. On July 14, 2020, another TMS employee named Giovanni repeated this claim. At least one of these employees encouraged Ms. Davis encouraged her to sell her home instead.

56. Upon information and belief, TMS failed to provide adequate training to its employees regarding the CARES Act and has failed to adequately supervise its employees regarding compliance with the CARES Act.

57. Upon information and belief, TMS is subject to government monitoring and auditing by the FHA regarding its compliance with the CARES Act and other servicing requirements.

TMS's Failure to Follow Federal Servicing Law

58. As the servicer on her federally-related mortgage loan, TMS is subject to obligations under RESPA and its associated regulation, Regulation X.

59. TMS is required to maintain policies and procedures designed to, among other things, provide timely and accurate information to borrowers and investigate, respond to, and make corrections in response to borrower complaints. 12 C.F.R. § 1024.38.

60. Even though Ms. Davis repeatedly lodged complaints about the strangers who entered her property, TMS took no action to change the manner by which it and SLFS performed property inspections on her property.

61. Even though Ms. Davis repeatedly requested a forbearance pursuant to the CARES Act from TMS, TMS refused to provide her with a forbearance and instead provided her with false information about the CARES Act.

62. Either TMS's policies and procedures pursuant to 12 C.F.R. § 1024.38 are inadequate, or TMS failed to follow its policies and procedures when dealing with Ms. Davis.

63. Furthermore, whenever it receives a "notice of error" or a "qualified written request" from one of its customers, TMS is obligated by 12 C.F.R. §§ 1024.35(e) to respond by either "[c]orrecting the error or errors identified by the borrower and providing the borrower with a written notification of the correction, the effective date of the correction, and contact information, including a telephone number, for further assistance" or "[c]onducting a reasonable investigation and providing the borrower with a written notification that includes a statement that the servicer has determined that no error occurred, a statement of the reason or reasons for this determination, a statement of the borrower's right to request documents relied upon by the servicer in reaching its determination, information regarding how the borrower can request such documents, and contact information, including a telephone number, for further assistance."

64. Ms. Davis sent TMS a qualified written request and a notice of error on September 4, 2020. In the request she specifically disputed the information TMS employees had given her regarding lump sum repayment requirements, and reiterated her request for a forbearance pursuant to the CARES Act.

65. Ms. Davis's qualified written request was sent to the correct address and concerned a proper topic for purposes of a notice of error under Regulation X because it concerned TMS's "failure to provide accurate information to a borrower regarding loss mitigation options and foreclosure…" and "other error[s] relating to the servicing of a borrower's mortgage loan." 12 C.F.R. § 1024.35(b).

66. TMS ignored her request for a forbearance – i.e., failed to correct its error – and conducted no investigation nor provided her with any response regarding the erroneous information that TMS had provided her and she had disputed.

67. Either TMS's policies and procedures for handling qualified written requests and notices of error are inadequate, or TMS failed to follow its policies and procedures when dealing with Ms. Davis.

68. As a result of TMS's refusal to give Ms. Davis a forbearance, she faces the loss of opportunity to keep her home, increased costs and fees, and the potential foreclosure of her home. She worries constantly that she will lose her home to foreclosure and that a marshal will come to her home to evict her. She needs the time a forbearance would provide to solidify her income and obtain a loan modification.

TMS Has Treated Several Other Customers Like Ms. Davis

69. In the past three years, at least eleven mortgage borrowers have complained to the CFPB about receiving poor servicing when applying for a workout from TMS, including claims of incorrect evaluation for loan workout options.

70. Since the CARES Act was implemented, at least five other customers have complained to the CFPB about TMS's failure to fulfill its obligations under the CARES Act with respect to forbearances.

71. At least two other homeowners have brought viable claims against TMS based on its failure to comply with obligations under RESPA and Regulation X with respect to qualified written requests, notices of error, and/or requests for information. *See Diehl v. Money Source, Inc.*, Docket No. CIVIL ACTION 17-0125-WS-B, 2018 WL 2995721 (S.D. Ala. Jun. 13, 2018); *Lewis v. Money Source, Inc. (In re Lewis)*, Docket No. 5-19-bk-1837 RNO, Adversary No. 5-19-ap-115 RNO, 621 B.R. 626, 2020 WL 6322061 (Bankr. M.D. Pa. Oct. 28, 2020).

**Count I – as to TMS and SLFS**
**Violation of the Fair Housing Act**

72. Ms. Davis restates and incorporates all her statements and allegations contained in paragraphs 1 through 47 in their entirety, as if fully rewritten herein.

73. Two of the strangers sent by TMS and SLFS to "inspect" her home subjected her to discriminatory statements in violation of 42 U.S.C. § 3604(c) by indicating a dispreference for Black residents like her in the city and neighborhood where she lives.

74. The stranger sent by TMS and SLFS who damaged her garage door subjected her to discriminatory treatment in violation of 42 U.S.C. § 3604(b).

75. The strangers were agents of TMS and SLFS, and TMS and SLFS are liable for the Fair Housing Act violations of their agents.

76. The TMS employee who fielded Ms. Davis's complaint about the stranger who broke her garage door and called her a racial slur discriminated against Ms. Davis by failing to take her complaint seriously.

77. TMS and SLFS further violated the Fair Housing Act by failing to provide proper training to their employees and agents of their obligations under the Fair Housing Act.

78. As a result of these violation of the Fair Housing Act, Ms. Davis suffered significant emotional distress, financial loss, and violation of her civil rights.

**Count II – as to TMS and SLFS**
**Trespass**

79. Ms. Davis restates and incorporates all her statements and allegations contained in paragraphs 1 through 47 in their entirety, as if fully rewritten herein.

80. TMS and SLFS illegally trespassed on Ms. Davis's property and/or caused a situation where illegal entries and trespasses were likely to occur.

81. As a result of TMS and SLFS's actions or inactions regarding the unlawful entry or entries on the plaintiff's property, the plaintiff's property was damaged and she suffered significant emotional damage, all to the plaintiff's loss and damage.

**Count III – as to TMS and SLFS**
**Negligent Supervision**

82. Ms. Davis restates and incorporates all her statements and allegations contained in paragraphs 1 through 71 in their entirety, as if fully rewritten herein.

83. TMS and SLFS knew or should have known that the property inspection services described herein involved an unreasonable risk of causing emotional distress to Ms. Davis.

84. TMS and SLFS each had a non-delegable duty to Ms. Davis to properly supervise their agents in the course of their duties, including but not limited to, their entry into the homes of homeowners facing foreclosure, including Ms. Davis's home, their hiring and retention

practices with respect to the individuals assigned to perform such work, and their handling of complaints from customers like Ms. Davis regarding property inspection practices. Such agents include all the strangers sent to Ms. Davis's home.

85. Given such factors as the sensitive nature of the work, including the intrusions upon seclusion and invasions of privacy such work entails, TMS and SLFS's failure to properly supervise such individuals could reasonably led to situations homeowners suffered emotional injuries as a result of such activities.

86. TMS and SLFS each failed or neglected to adequately instruct and monitor its agents with respect to property inspection services, including the Fair Housing Act, leading to circumstances in which the illegal entries and trespasses of Ms. Davis's property and illegal interactions with Ms. Davis, as described herein, were likely to occur.

87. Such failure or negligence was the proximate cause of the foreseeable injuries and resulting damages suffered by Ms. Davis.

## Count IV – as to TMS
## Violation of Real Estate Settlement Procedures Act (RESPA)

88. Ms. Davis restates and incorporates all her statements and allegations contained in paragraphs 1 through 71 in their entirety, as if fully rewritten herein.

89. TMS violated RESPA and Regulation X in the manner by which it responded to Ms. Davis's complaints about property inspections, and by the manner by which it handled Ms. Davis's qualified written request and notice of error.

90. As a result of TMS's violations of RESPA and Regulation X, Ms. Davis has suffered actual damages in the form of monetary loss, significant emotional damages, and lost

opportunity to pursue workout options on her loan and, as a result, a greater likelihood of foreclosure.

91. TMS's treatment of Ms. Davis's qualified written request and notice of error is consistent with a pattern or practice of failing to respond to its customers' complaints, qualified written requests, and notices of error and a pattern or practice of failing to service its mortgage accounts in accordance with RESPA and Regulation X. It is therefore liable for statutory damages.

### Count V – as to TMS and SLFS
### Connecticut Unfair Trade Practices Act
### Unfair Practices

92. Ms. Davis restates and incorporates all her statements and allegations contained in paragraphs 1 through 71 in their entirety, as if fully rewritten herein.

93. The actions of TMS and SLFS were done in the conduct of trade or commerce.

94. TMS and SLFS each constitute a "person" within the meaning of Conn. Gen. Stat. § 42-110b(a), as defined in Section 42-110a(3).

95. TMS has engaged in unfair acts or practices within the meaning of Conn. Gen. Stat. § 42-110b(a), including:

    a. its failures to adequately train and supervise its employees and agents with respect (i) to property inspections (including its apparent disregard of supervisory bulletins from the CFPB), and (ii) their obligations under the Fair Housing Act;

    b. the inadequate manner by which it handled written and verbal complaints from Ms. Davis;

    c. its failure to comply with federal law with respect to Ms. Davis's request for a forbearance; and

    d. its violations of the Fair Housing Act.

96. SLFS has engaged in unfair acts or practices within the meaning of Conn. Gen. Stat. § 42-110b(a), including (a) its failures to adequately train and supervise its employees and agents with respect to property inspections and the Fair Housing Act, and (b) its violations of the Fair Housing Act.

97. TMS and SLFS's acts towards Ms. Davis consistently contravened public policy, including federal law and public policy regarding the sanctity of one's home.

98. TMS and SLFS's acts were immoral, unscrupulous, unethical, and oppressive.

99. TMS and SLFS's actions caused substantial injury to Ms. Davis and consumers like her, injury which she could not have reasonably avoided.

100. This injury was not outweighed by any countervailing benefits to Ms. Davis or consumers like her that the conduct produced.

101. As a result of the foregoing acts, Ms. Davis has suffered an ascertainable loss as that term is used in Conn. Gen. Stat. § 42-110g(a). Specifically, Ms. Davis has been charged improper fees and interest and lost twelve months' opportunity to obtain a loan workout and save her home. She also suffered significant emotional damages.

### Count VI - as to TMS
### Connecticut Unfair Trade Practices Act
### Deceptive Practices

102. Ms. Davis restates and incorporates all her statements and allegations contained in paragraphs 1 through 71 and 93 through 94 in their entirety, as if fully rewritten herein.

103. TMS has engaged in deceptive acts or practices within the meaning of Conn. Gen. Stat. § 42-110b(a).

104. TMS made misleading representations and omitted information in its communications with Ms. Davis by refusing to giving her a forbearance as required under

federal law and by claiming that, if it did give her a forbearance, she would be required to repay all the missed payments in a lump sum upon the end of the forbearance period.

105. As a result of TMS's deceptive acts or practices, Ms. Davis suffered damages as detailed herein, including improper fees and interest, and her loss of twelve months' opportunity to obtain a loan workout and save her home. She also suffered significant emotional damages. These injuries were not outweighed by any countervailing benefits to Ms. Davis or consumers like him that the conduct produced.

### Count VII – as to TMS
### Connecticut Unfair Trade Practices Act
### Intentional or Reckless Practices

106. Ms. Davis restates and incorporates all her statements and allegations contained in paragraphs 1 through 71 and 93 through 94 in their entirety, as if fully rewritten herein.

107. Throughout the relevant period, TMS has acted with reckless indifference to the rights of Ms. Davis.

108. TMS's actions and failures to act were willful and exhibited a blatant disregard for Ms. Davis's well-being.

109. As a result, Ms. Davis is entitled to an award of punitive damages.

### REQUEST FOR RELIEF

**WHEREFORE**, Ms. Davis requests that the Court award her with the following:

(a)  Actual and compensatory damages pursuant to common law, Conn. Gen. Stat. § 42a-110g, 12 U.S.C. § 2605, and 42 U.S.C. § 3613;

(b)  Statutory damages pursuant to 12 U.S.C. § 2605;

(c)     Punitive damages pursuant to common law, Conn. Gen. Stat. § 42-110g, and 42 U.S.C. § 3613; and

(d)     Reasonable attorneys' fees and costs pursuant to Conn. Gen. Stat. §§ 42-110g and 42-150bb, 12 U.S.C. § 2605, and 42 U.S.C. § 3613.

together with such other and further relief as the Court deems just and proper.

    Respectfully submitted,
    Plaintiff Paulette Davis

    /s/ Jeffrey Gentes
    Jeffrey Gentes (ct28561)
    Connecticut Fair Housing Center
    60 Popieluszko Court
    Hartford, CT  06106
    860-263-0741
    jgentes@ctfairhousing.org