## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

PAULETTE DAVIS,

                Plaintiff,

v.

THE MONEY SOURCE INC.
SERVICELINK FIELD SERVICES, LLC, and
MMC CONTRACTING SERVICES INC.

                Defendants.

Case No. 3:21-cv-47-AWT

May 6, 2021

## PLAINTIFF'S OPPOSITION TO
## DEFENDANTS' MOTIONS TO DISMISS PLAINTIFF'S AMENDED COMPLAINT
## AND TMS'S MOTION TO STAY

Plaintiff Paulette Davis submits this opposition to the May 3, 2021 motions to dismiss her amended complaint by two of the three defendants ("Defendants" unless otherwise specified). Defendant The Money Source Inc., the owner of legal title to her home, and Defendant ServiceLink Field Services, LLC, the agent TMS directed to enter her property to inspect her dwelling, each violated the Fair Housing Act by subjecting Ms. Davis to racist comments and the n-word, and did nothing in response to her complaints. Their trespasses exceeded whatever limited authority they had to enter her property. Defendants' attempts to avoid liability for negligent supervision of their agents, violating the Connecticut Unfair Trade Practices Act, and, for TMS, violations of the Real Estate Settlement Procedures Act (RESPA), rely on ignoring her allegations and the caselaw. All their arguments are insufficient to warrant dismissal.

Furthermore, TMS can support neither a request for abstention because Ms. Davis seeks damages, nor a stay under the prior pending doctrine given the lack of another federal case and the federal statutes at play here. Its request to stay the current action should be denied.

## COUNTERSTATEMENT OF FACTS

Ms. Davis is a Black resident of Waterbury. Am. Compl. ¶ 8 (referred to throughout as Compl.). She lives on a dead-end street in a quiet, residential neighborhood that borders a golf course. *Id.* at ¶ 30. There is very little traffic down her street; any car that does not belong to a neighbor stands out. *Id.* Hers is one of only two households of color in the area. *Id.*

Soon after she fell behind on her Federal Housing Administration-backed mortgage a few years ago, attached hereto as Exhibit A, and dealt with the intervening annulment of her marriage since, Ms. Davis has done whatever she could to stabilize and increase her income. *Id.* at ¶¶ 12, 18, 21. She has commuted to Greenwich for work, taken in an international student, and took on an in-home patient. *Id.* at ¶ 21. And she has stayed in contact with TMS throughout regarding her continued occupancy and desire to keep her home through a loan workout. *Id.* at ¶ 19. She even quit nursing school at TMS's instructions so that she could spend more time working. *Id.* at ¶ 20.

<u>TMS and SLFS Repeatedly Confront Ms. Davis at Her Home.</u>

Notwithstanding its regular communications with Ms. Davis and her cooperation, TMS directed SLFS to perform regular monthly inspections for which Ms. Davis has been charged. *Id.* at ¶¶ 23, 24. Neither Defendant told her that these inspections would be occurring, nor why, leaving her surprised as to why strangers were appearing on her property without warning or invitation. *Id.* at ¶¶ 31-32. Ms. Davis has often been home during these inspections by TMS and SLFS. When she encountered one of these workers, the worker grew annoyed and told her "I don't know why you're here. Go back to Bridgeport. I don't know where all you n----rs are coming from. This is not your house." *Id.* at ¶ 32. He told her the house belonged to the mortgage company, not her. *Id.* He also pointed to a "No Trespassing" sign that was just beyond her fence, on the golf course of the neighboring country club. *Id.* at ¶ 33. He told her that this

was the only spot in the neighborhood where there was such a sign, and that it was there because the country club was concerned that she and her family would try to rob the club's golfers. *Id.* Before he left the property, he tried to forcibly open and ultimately broke her garage door. *Id.*

Ms. Davis's next encounter with a property inspector for Defendants was also intimidating and upsetting. Upon finding him, she asked if he intended to do damage to her property like the last stranger had. *Id.* at ¶ 37. He said that he did not blame the prior stranger because that stranger may have thought she was at the property stealing copper rather than living there, given the neighborhood and her complexion. *Id.*

Ms. Davis has had many other unpleasant interactions with property inspectors, and they continued till at least the commencement of this action, even though she has been trying to work with TMS to obtain a workout of her mortgage. *Id.* at ¶ 43. Most are men, and almost all the workers are white. *Id.* at ¶ 39. Many times the inspectors would ignore her, even if she were outside, and only acknowledged her if she spoke to them. *Id.* at ¶¶ 41, 42. She wondered if they ignored her because they assumed that, as a Black woman, she was part of the help rather than the homeowner. *Id.* at ¶ 41. One even gave her a middle finger after she spoke to him. *Id.* at ¶ 42. Another scared her by pointing what she initially feared was a gun at her; it turned out to be a camera, and the man yelled "Property Inspection" before going away. *Id.* at ¶ 45.

Once Ms. Davis learned that these workers were sent at the behest of its mortgage company, something TMS repeatedly confirmed, she began lodging complaints about her interactions. *Id.* at ¶¶ 36, 40. She told TMS she was worried about people looking through her windows, scaring her underaged grandson. *Id.* at ¶ 40. She offered to set up regular appointments for the inspections; if the inspections really were required, she was happy to oblige rather than be startled each time a stranger invited themselves onto her property. *Id.*

TMS refused to take Ms. Davis up on her offer, and was generally dismissive of what it and SLFS were doing to her. *Id.* Once, when she threatened to call the police on the next intruder, TMS told her that the police would arrest her instead. *Id.* at ¶ 44. Upon information and belief, TMS and SLFS have taken no action to either investigate Ms. Davis's complaints or reprimand, discipline, or otherwise alter their relationship with their agents even though Ms. Davis alerted TMS to the racial nature of their comments and even though TMS and SLFS worked together to send those agents to her property. *Id.* at ¶ 38. Upon information and belief, TMS and SLFS continue to send the two workers who made the most racist comments to other customers' homes, including other customers who are Black. *Id.* Furthermore, TMS and SLFS's handling of Ms. Davis's complaint was consistent with how they handle complaints relating to property inspection, property preservation, and discrimination from homeowners. *Id.* at ¶ 48.

Ms. Davis Requests a CARES Act Forbearance

The first major federal COVID-19 pandemic relief bill, the CARES Act, entitled homeowners with federally-backed mortgages, including the FHA-backed one Ms. Davis has, to request forbearance – a pause on foreclosure, fees, and payments – initially for 180 days upon request, and up to 360 days total, irrespective of the loan's default status. *Id.* at ¶¶ 50-52. The FHA instructed servicers like TMS that they could not require homeowners to make up missed payments with a lump sum at forbearance's end. *Id.* at ¶ 55.

TMS has nevertheless refused to provide Ms. Davis with a forbearance despite her repeated requests. *Id.* at ¶ 56. Furthermore, several representatives told her over the phone that, even if she did receive a forbearance, she would be required to make up all the payments at once at the end of the period. *Id.* at ¶ 57. One employee even told her to sell her home instead. *Id.*

To both complain and put her request in forbearance in writing, Ms. Davis sent TMS a "qualified written request" (QWR) pursuant to RESPA that contained a "notice of error" pursuant to Regulation X. Docket Entry 40-2. She explained that TMS's lump sum repayment requirement was erroneous and reiterated, in bold, her request for a forbearance. *Id.* In responding to her request, TMS inaccurately description of what the FHA required – a "90-day special forbearance," followed by either a lump sum repayment or evaluation for a different loan workout. Docket Entry 40-3.[1] TMS failed to grant her request for a forbearance, admit that it had given her erroneous information, nor do anything to suggest it had engaged in an investigation of any sort other than a so-called "thorough[] review[]" after which it had concluded her loan was FHA-backed, something she had already told TMS. *Id.*; *see also* Compl. ¶ 68.

Based on other consumers' lawsuits and complaints filed with the federal Consumer Financial Protection Bureau, TMS's treatment of Ms. Davis fits into a pattern of non-compliance with the CARES Act and its obligations when responding to QWRs. Compl. ¶¶ 71-73.

Effects on Ms. Davis of TMS's and SLFS's Conduct.

As a result of Defendants' actions, Ms. Davis no longer feels safe at her own home. *Id.* at ¶ 46. She lives in constant fear of having to confront another stranger at her home and worries the consequences will be more than a broken garage door. *Id*. She wonders what she has done to be treated less than human. *Id*. at ¶ 41. She faces the loss of opportunity to keep her home, increased costs and fees charged by Defendants, and the potential foreclosure of her home. *Id.* at ¶ 70. She worries constantly about losing her home to foreclosure and a marshal evicting her. *Id.* And she lives without the peace and quiet to which she is entitled. *Id.* at ¶ 47.

---

[1] Plaintiff did not receive the TMS cover letter with its "investigation" results. Even if she had, the response is inadequate as a matter of law, for the reasons detailed in Section V, *infra*.

**ARGUMENT**

**I.     Applicable Standard of Law**

In evaluating a 12(b)(6) motion to dismiss, courts accept as true all the factual allegations

in the complaint and draw "all inferences in the plaintiff's favor." *See Biro v. Conde Nast*, 807

F.3d 541, 544 (2d Cir. 2015). A complaint need only contain "enough facts to state a claim of

relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A

claim is plausible so long as the plaintiff's allegations "allow[] the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Biro*, *supra*, 807 F.3d at 544

(*quoting Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Factual disputes "do not factor into a

plausibility analysis." *Tucker v. Am. Int'l Group*, 936 F. Supp. 2d 1, 6 (D. Conn. 2013).

**II.    A Mortgage Company and Its Dwelling Inspector Can be Held Liable for Racist
        Post-Acquisition Conduct Under the Fair Housing Act.**

A.   The Fair Housing Act Prohibits Discriminating Against a Mortgagor.

Section 3604 of the Fair Housing Act prohibits discrimination in the "terms, conditions,

or privileges of sale or rental of a dwelling, or in the provision of services or facilities in

connection therewith." 42 U.S.C. § 3604(b). Such activities include activities connected to

mortgage lending. *Bank of Am. v. City of Miami, FL*, 137 S.Ct. 1296 (2017). The Act further

prohibits statements "with respect to the sale or rental of a dwelling" that indicate a preference

for any preference, limitation, or discrimination based on race. 42 U.S.C. § 3604(c).

Section 3605 of the Fair Housing Act also prohibits discrimination by anyone "whose

business includes engaging in residential real estate-related transactions to discriminate against

any person…in the terms of conditions of such a transaction" on the basis of race. 42 U.S.C. §

3605. Section 3605 covers matters like property insurance because "individuals are often unable

6

to purchase or to maintain financing for homes without" it. *Nat'l Fair Hous. Alliance, Inc. v. Prudential Ins. Co. of Am.*, 208 F.Supp.2d 46, 58 (D.D.C.2002).

Section 3617 of the Fair Housing Act further prohibits action that would "coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of" their rights under the Act. 42 U.S.C. § 3617. To prevail on a section 3617 claim, a plaintiff must show that: (1) she was engaged in a protected activity; (2) the defendant was aware of this activity; (3) the defendant took adverse action against the plaintiff; and (4) a causal connection exists between the protected activity and the adverse action. *Gilead Cmty. Servs. Inc v. Town of Cromwell*, 432 F. Supp. 3d 46, 77 (D. Conn. 2019).

The FHA is intended "to provide, within constitutional limitations, for fair housing throughout the United States."  42 U.S.C. § 3601. To that end, the FHA is to be construed broadly and given "generous construction." *Trafficante v. Metro Life Ins. Co.*, 409 U.S. 205, 209, 211-212 (1972) (holding that FHA is "broad and inclusive" and implements a "policy that Congress considered to be of the highest priority" which can be given effect "only by a generous construction"); *Cabrera v. Jakabovitz*, 24 F.3d 372 (2d Cir. 1994) (holding that the FHA should be given broad and liberal construction), *superseded by statute on other grounds*.

To the extent that Ms. Davis brings her claims against Defendants because of the conduct of their employees and agents, vicarious liability, a principal's legal responsibility to supervise and liability for the conduct of its agents, is relevant here. Vicarious liability is critical to fair housing enforcement; otherwise, for instance, "[i]t would be too easy for the broker or owner to plead ignorance when a [real estate] agent" engaged in discrimination. *Cabrera v. Jakabovitz*, *supra*, 24 F.3d at 389. Principals are vicariously liable for their agents' violation of fair housing

laws if the violation occurs while the agent was acting on behalf of the principal. *See United States v. Hylton*, 944 F. Supp. 2d 176, 192 (D. Conn. 2013), *aff'd*, 590 F. App'x 13 (2d Cir. 2014). This principle holds even if "it seems harsh to punish innocent and well-intentioned" principals. *Saunders v. Gen. Srvcs. Corp.*, 659 F. Supp. 1042, 1059 (E.D. Va. 1987).

    B.  <u>The Fair Housing Act's Coverage of Post-Acquisition Conduct</u>

The Second Circuit released its most recent opinion regarding so-called post-acquisition conduct, albeit in the specific context of section 3604(b), a few weeks ago. The case at issue involved a tenant's attempt to hold his landlord liable under the Fair Housing Act based on the conduct of the neighbors. In the *en banc Francis v. Kings Park Manor et al.*, --- F.3d. ---, No. 15-1823-cv, 2021 WL 1137441 (2d Cir. Mar. 25, 2021), the Circuit reversed, by a vote of 7-5, a 2-1 panel decision in favor of the tenant, holding that landlords cannot be presumed to have the degree of control over tenants necessary to hold landlords liable under the Act for neighbor-on-neighbor conduct in the absence of an allegation of discriminatory intent. While the initial panel had held the Act would prohibit conduct affecting one's "enjoyment of residence in a dwelling or in the provision of services associated with that dwelling after acquisition," the *en banc* Circuit declined to "consider to what extent the FHA's prohibition of discrimination reaches conduct engaged in after a tenant acquires a dwelling." *Id.* at *8 n.50.

In one of two decisions that concurred in part and dissented in part, Judge Lohier (joined by four other judges) explained that "[i]nstead of assuming the FHA applies to post-acquisition discriminatory conduct [as does the majority], I would squarely hold that it does." *Id*. at *15. Judge Lohier observed that no "active member" of the Circuit "signaled disagreement with this principle." *Id.* Judge Lohier explained that the plain text of 3604(b)– the words "conditions," "privileges," and "provisions of services or facilities" – "refer not just to the sale or rental itself,

but to benefits and protections following the sale or rental." *Id.* at *16. That construction was consistent with "Congress's central intent to use the FHA to root out discrimination in housing" and the holdings of seven other Circuits. *Id.* The Act's coverage to post-acquisition discriminatory conduct in housing is therefore "beyond serious dispute." *Id.* at *17.

This Second Circuit caselaw is consistent with earlier cases in this District. For instance,

> … this Court concludes that the FHA and [Connecticut Fair Housing Act] apply to post-acquisition claims, because (1) the words "privileges" and "services or facilities" in the statutes connote continuing rights beyond the acquisition of housing; (2) HUD regulations, which the Supreme Court has recognized as holding "great weight," recognize such claims, and (3) such claims are consistent with the "broad and liberal construction" given to the FHA and CFHA.

*Viens v. Am. Empire Surplus Lines Ins. Co.*, 113 F. Supp. 3d 555, 569 (D. Conn. 2015); *see also Rhodes v. Advanced Prop. Mgmt. Inc.*, No. 3:10–CV–826 (JCH), 2011 WL 2076497, at *4 (D. Conn. 2011) (allowing homeowner's claim based on discrimination in provision of repairs).

Section 3604(c), regarding discriminatory statements, is similarly broad and not limited to a particular sale or rental. As the Second Circuit has explained:

> Nothing in this language limits the statute's reach to owners or agents or to statements that directly effect a housing transaction. Indeed, this language "does not provide any specific exemptions or designate the persons covered, but rather ... applies on its face to anyone" who makes prohibited statements ... The statute also "protect[s] against [the] psychic injury" caused by discriminatory statements made in connection with the housing market … In fact, we have permitted plaintiffs to recover for discriminatory advertising even when the plaintiffs were not in the market for housing.

*United States v. Space Hunters, Inc.*, 429 F.3d 416, 424–25 (2d Cir. 2005) (citations omitted).

While most of the caselaw around post-acquisition activity involves rental units, there is no reason that an Act that expressly applies to a "sale or rental" should only proscribe post-acquisition behavior to rental units. Moreover, a mortgage grants the mortgagee certain post-

acquisition rights to the dwelling including, in Connecticut, legal title to the property.[2] *See* Conn. Gen. Stat. § 47-36h (mortgage deed has the force and effect of a deed to the mortgagee in fee simple); Caron, D. and Milne, G, *Connecticut Foreclosures*, 2019 edition, § 3.5 ("Connecticut follows the title theory of mortgages, which provides that upon execution of a mortgage, the mortgagee acquires legal title, with the mortgagor retaining only the equitable title right of redemption."). The nature of that "mortgage deed" relationship and the nature of post-acquisition rights and activities, including those detailed in Ms. Davis's complaint but also including the ongoing payments and other servicing activities over the decades a mortgage may be in effect, militate in favor of coverage by the remedial Fair Housing Act.

District courts in the Second Circuit have had few, if any, opportunities to analyze post-acquisition conduct in the context of a mortgage lender and its agent's activities under section 3604 or 3605. But several others have. For instance, in *Nat'l Fair Housing Alliance v. Bank of Am., N.A.*, 401 F. Supp. 3d 619 (D. Md. 2019), the court held that allegations concerning a lender's decision to delegate its property maintenance duties to a third party, and its failure to supervise that third party, could constitute a violation of section 3604. The properties were more than beyond sale or loan origination – they were post-foreclosure. A judge came to a similar conclusion with respect to properties owned by Fannie Mae, a mortgage purchaser in the secondary market. *See Nat'l Fair Housing Alliance v. Federal Nat'l Mortg. Ass'n*, 294 F. Supp. 940 (N.D.Ca. 2018); *see also Rodriguez v. Bear Stearns Companies, Inc.*, Civil Action No. 07–cv–1816 (JCH), 2009 WL 995865 (D. Conn. Apr. 14, 2009) (defendant who purchased mortgages post-origination was subject to 3605 claim based on predatory servicing).

---

[2] One of Defendants' agents even told Ms. Davis that the house belonged to the mortgage company. Compl. ¶ 32.

C. <u>Ms. Davis's Allegations Were Adequate</u>

Ms. Davis alleged that her mortgage company TMS, a/k/a the entity with legal title to her home and possessor of certain, ongoing rights under the mortgage deed itself, and the company it hired to inspect her dwelling, SLFS, violated the Fair Housing Act's prohibition on differential treatment based on her race – specifically, being Black. *See*, *e.g.*, Compl. ¶¶ 1, 23, 36, 38, 40. After she used the mortgage to purchase her home, Defendants violated the Act, in particular, by (1) damaging her dwelling's garage door because she was Black, (2) subjecting her repeatedly to discriminatory statements about her race, including a despicable slur for Black people, (3) failing to take her complaints about discriminatory treatment seriously, and (4) failing to provide proper training to their employees and agents of their obligations under the Act. *See, e.g.,* Compl. ¶¶ 48, 75-79. This post-acquisition conduct violated section 3604(b)'s prohibition on discriminatory treatment in connection with the sale of a dwelling and 3604(c)'s prohibition on discriminatory statements regarding where she purchased her home.

Defendants' conduct also violated section 3605. Much like individuals buy homeowners insurance in order to purchase a home, Ms. Davis entered into a mortgage agreement in order to purchase her home with an FHA-backed loan. *See Nat'l Fair Hous. Alliance, Inc. v. Prudential Ins. Co. of Am.*, *supra*, 208 F.Supp.2d at 58 (3605 covers transactions necessary to purchase a home). Defendants assert their inspection activity is permissible enforcement of the terms and conditions of that mortgage agreement. *See* TMS Mem. at 8-9; SLFS Mem. at 12-13. TMS, the owner and servicer of her mortgage, and SLFS, a company TMS retained to inspect her home pursuant to the terms of her mortgage, are therefore engaged in real estate-related transactions for purposes of section 3605. Because Ms. Davis, a Black mortgagor, was subjected to

discriminatory treatment during Defendants' property inspections, such post-purchase actions are covered by section 3605 because they related to enforcement of the mortgage..

With respect to section 3617, Ms. Davis alleged that (1) she is a Black woman living in her own home, a protected activity, (2) Defendants, through their agents the property inspectors, were aware of that activity, (3) Defendants took adverse action in that an agent both intimidated and threatened her by telling her she and other Black residents in the area should move back to Bridgeport and broke her garage door, and (4) Defendants explicitly connected her race to their activity through the racist statements the agent made. Those allegations cover all four elements of a section 3617 claim.

Moreover, because a principal may be vicariously liable for its agents' violations of the Fair Housing Act when agents act its behalf, and because TMS itself, and the agents TMS and SLFS sent, all said they were working together on TMS's behalf, TMS and SLFS are vicariously liable for the treatment and statements to which Ms. Davis was subjected. Based on the foregoing, Ms. Davis adequately pleaded that each violated the Fair Housing Act.

   D.   <u>Defendants' Arguments Rely on a Case from the Wrong Supreme Court and on a Cramped Reading of the Fair Housing Act.</u>

TMS challenges the ability of Ms. Davis to assert a claim under section 3604 but does not address or dispute sections 3605 or 3617, and so waives any right to do so in its reply. SLFS challenges Ms. Davis's claims under each of the three sections.

Defendants' arguments in favor of dismissal rely on cramped readings of the Fair Housing Act. First, they argue that since their discriminatory conduct occurred after Ms. Davis purchased her home with a mortgage that TMS holds and under which both TMS and SLFS allege they had trespass authority, the conduct was not technically connected to a "sale or rental." In making this argument, each Defendant tries to stretch *Francis v. Kings Park Manor*

12

much further than it can go. *See* TMS Mem. at 6, 7; SLFS Mem. at 5 (thought it only cited the earlier panel decision). As explained *supra*, *Francis* only stands for the proposition that a landlord is not responsible for the discriminatory actions of neighbors in the absence of allegations of the landlord's discriminatory intent. While the *en banc* Second Circuit reversed a panel decision to the contrary, it did not limit post-acquisition coverage of the Fair Housing Act to any significant degree. Given this lack of support, each Defendant turned to Seventh Circuit caselaw instead. *See* TMS Mem. at 5, SLFS Mem. at 6, 7. Because this case is in the Second Circuit, the Seventh Circuit's decisions are neither controlling nor even persuasive. Moreover, for all the reasons discussed above relating to the broad scope of the Fair Housing Act, including coverage of post-acquisition activities in the Second Circuit and the applicability of section 3605 to activities regarding the terms and conditions of financing the purchase of residential real estate, their arguments fall flat.

Second, with respect to Section 3604, they argue that only Section 3605 can be used to address discriminatory conduct connected to mortgage financing. In doing so, they rely heavily on a state foreclosure case from eighteen years ago, *Webster Bank v. Oakley*, 265 Conn. 539 (2003). There the defendant alleged the lender's failure to accommodate her disability violated section 3604(f) of the Fair Housing Act. (She had offered Webster a choice of at least two temporary accommodations. *Id.* at 565 n.26.) The Court rejected this claim, finding that section 3604 could not apply to enforcement of a mortgage – despite 3604 being "linguistically appealing" – because of "the existence of § 3605." *Id.* at 557. The Court held that "discrimination in the enforcement of a mortgage loan agreement 'unambiguously [fell] within the ambit of 42 U.S.C. § 3605.'" *Id.* at 588.

Relying on *Webster Bank v. Oakley* presents several problems. First, Ms. Davis brought a claim under § 3605 as well, meaning any attempt to dismiss her Fair Housing Act claims in their entirety is futile. Second, *Webster Bank* is not controlling because Connecticut law, including its own state Fair Housing Act, is not at issue in this claim. Third, the *Webster Bank* court's strict construction of the Fair Housing Act – believing that 3605's language reflects an intention to exclude mortgage-related conduct from section 3604, despite its acknowledgment of the breadth of 3604's plain text – is inconsistent with the remedial purposes of the Fair Housing Act, and more recent federal decisions like the Supreme Court's *Bank of Am., N.A. v. City of Miami*, *supra*, that analyzed the applicability of 3604 to mortgage-related conduct. Fourth, the court's broad conclusion, in effect, that mortgage companies are not required to make certain kinds of reasonable accommodations in working with their disabled customers is inconsistent with the remedial scope of the Act and the 1988 amendments thereto relating to disability. Fifth, the arguments one can make about *Webster Bank v. Oakley*, where 3604(c) was not at issue, cannot be stretched to apply to the 3604(c) claim here, as there is no credible argument that Congress intended to create an exception for discriminatory statements about housing preferences so long as they were connected to a mortgage rather than a sale or rental. Lastly, *Webster Bank v. Oakley* was decided at a time, pre-*U.S. Bank, N.A. v. Blowers*, 332 Conn. 656 (2019), when defenses to foreclosure actions were rarely available to homeowners. This environment likely discouraged the court from endorsing a defense that did not attack the validity or origination of the mortgage.

As an agent of a mortgage company, SLFS argues that it should not be held liable under Section 3605 because it does not provide mortgage financing and therefore is not engaged in residential real estate-related transactions for purposes of the Act. SLFS. However, its business involves activities intertwined with mortgages – property inspection and property preservations

14

conducted pursuant to the conditions in the mortgage. Moreover, the *Webster Bank v. Oakley*
decision on which SLFS relies so heavily explicitly held that enforcement of a mortgage
agreement is covered activity, and SLFS agrees that its inspection activities were connected to
that mortgage. *See* SLFS Mem. at 12, 13. Given this fact and the broad, remedial purposes of the
Act, SLFS's business is covered under section 3605.

SLFS also argues that Ms. Davis failed to allege all the elements of a section 3605 claim.
But, in doing so, it cites the elements for a violation of the "making available" such a transaction
part of 3605 rather than the "terms and conditions of such a transaction." SLFS Mem. at 8. Ms.
Davis claims that Defendants treated her badly in the course of enforcing the terms and
conditions of the mortgage, a mortgage she used to purchase her dwelling, because she was
Black. Those allegations are covered under the plain text of section 3605. SLFS also cites to
*Germain v. M&T Bank*, 111 F. Supp. 3d 506 (S.D.N.Y. 2015) for the proposition that "not all
activities related to residential real estate transactions are covered." While "related" does have its
limits, the facts here are well within section 3605's scope, as opposed to *Germain* (prospective
commercial loan borrower cannot bring claim on behalf of himself rather than his prospective
tenants) or the decision it cites: *Jordan v. Chase Manhattan Bank*, 91 F. Supp. 3d 491, 504
(S.D.N.Y. 2015) (retail banking activities not covered).

TMS argues that it cannot be held liable for the conduct of SLFS's employees and agents
under section 3604, TMS Mem. at 7, and SLFS makes a similar argument with respect to MMC
in trying to avoid liability under section 3617. SLFS Mem. at 17. Both these arguments fail to
acknowledge the critical role of vicarious liability in enforcing the Fair Housing Act with respect
to both Defendants, and the allegations of agency discussed *infra*. Moreover, the admissions
from TMS and the agents that they were acting on TMS's behalf, the allegations concerning

15

TMS's refusal to modify its activities, its decision to continue sending its agents to Black customers' homes, and its failure to train its employees and agents on their obligations under the Fair Housing Act all are ample to attach direct liability to TMS.

Because Ms. Davis's allegations regarding the Fair Housing Act violations are adequate, she asks that she be allowed to continue to prosecute her fair housing claims.

## III.    Defendants Do Not Have Free Reign to Trespass on Ms. Davis's Property.

### A.   Ms. Davis Alleged the Relevant Elements of a Trespass Claim.

Ms. Davis brought claims for trespass against both defendants. Proving trespass requires "(1) ownership or possessory interest in land by the plaintiff; (2) invasion, intrusion or entry by the defendant affecting the plaintiff's exclusive possessory interest; (3) [that the trespass was] done intentionally; and (4) causing direct injury ..." *JMS Newberry, LLC v. Kaman Aerospace Corp.*, 149 Conn. App. 630, 641, *cert. denied*, 132 Conn. 915 (2014) (internal quotation marks omitted). A defendant can be held liable for trespass by causing someone else to commit a trespass irrespective of whether it itself entered the property or by approving of the trespass after it is done if the trespass is done for their benefit. *Mendez v. JPMorgan Chase Bank, N.A.*, 2016 WL 402008, *5 (Conn. Super. Ct., Jan. 8, 2016), *citing* 75 Am. Jur. 2d Trespass § 55 (in context of mortgagees like TMS and their agents like SLFS). This holds true even if the person who is employed is an independent contractor. *See Halkiotis v. WMC Mortg. Corp.*, 144 F. Supp. 3d 341, 364 (D. Conn.), *citing* Restatement (Second) of Torts § 427B ("One who employs an independent contractor to do work which the employer knows or has reason to know to be likely to involve a trespass upon the land of another . . . is subject to liability for harm resulting to others from such trespass . . .").

Ms. Davis owns and resides at the property at issue. TMS and SLFS repeatedly and intentionally entered the property, in violation of Ms. Davis's rights to her exclusive possessory

interest, and Ms. Davis was injured as a result of those entries. Compl. ¶¶ 81-83. She therefore can point to allegations supporting each element of her trespass claims.

B. Defendants Cannot Stretch the Mortgage Beyond Its Own Language nor the Bounds of Public Policy.

Both Defendants nevertheless seek dismissal of the trespass claim. TMS and SLFS essentially each argue that TMS has the unfettered right under the mortgage to trespass because Ms. Davis was behind, and SLFS argues its actions were conducted under that authority. This theory fails based on the language of the mortgage and the standards for a 12(b)(6) motion.

Any right Defendants had under the mortgage is conditional. Under the clause in TMS's Mem. at 8, entry onto Ms. Davis's property by Defendants must be "reasonable and appropriate," *see also* Ex. A, ¶ 9, something inherently fact-bound and not appropriate for a motion for summary judgment, never mind a 12(b)(6) motion. To the extent Ms. Davis offered to schedule such inspections when convenient for TMS and her, Compl. ¶ 40 and SLFS Mem. at 10, that offer was consistent with the requirement that any such entries be reasonable and appropriate.

Moreover, any contractual right Defendants might have under the mortgage, including a right of entry, is subject to an implied duty of good faith and public policy. *See Geysen v. Securitas Sec. Servs. USA, Inc.*, 322 Conn. 385, 399 (2016), *quoting Magnan v. Anaconda Indus., Inc.,* 193 Conn. 558, 567 (1984) (contract interpretation subject to reasonable expectations of contracting parties and public policy). That public policy includes limitations on TMS and SLFS's claims of a possessory right to the property. Neither has any such right, nor can they have rights greater than those of a landlord would have to property it actually owned – and even the latter's rights of entry into a tenant's unit are constrained by state prohibitions on "self-help," entry and detainer, and the like. *Norboe v. Wells Fargo Bank, N.A.*, 2018 WL 1137575, *6 (Conn. Super. Ct., Jan. 31, 2018) (*Ecker, J.*); *see also Francis v. CIT Bank*, 2021 WL 1124228,

17

*4 (Conn. Super. Ct. Feb. 25, 2021) (citing *Norboe* and explaining that entry and detainer

statutes inform public policy in interpreting a mortgage contract).

TMS also cites to the summary order in *Malick v. JP Morgan Chase Bank, N.A.*, 797 Fed.

App'x 563, 567 (2d Cir. 2019) to bolster its argument. In *Malick*, however, the plaintiff's claim

concerning the federal Fair Debt Collection Practices Act and other claims – none of which were

for trespass – were dismissed because the mortgagee and its agent's entries were actually

reasonable and appropriate. The homeowner was incarcerated at the time, and "the Property had

deteriorated from lack of winterization and general neglect; in addition, unknown persons had

vandalized the Property and had stolen durable goods, copper piping, and the personal effects of

Malick." *Id*. at 566. Because no such circumstances are present here, *Malick* cannot help TMS.

Nor can *Claude v. Wells Fargo Home Mortg.*, No. 3:13-CV-00535 (VLB), 2014 WL

4073215 (D. Conn. Aug. 14, 2014), help SLFS. There the court dismissed the trespass claim

because the plaintiff had failed to even allege a physical intrusion, something not applicable here.

C.  <u>TMS Is Liable for the Trespass of Its Agents.</u>

While simultaneously arguing that it has the unfettered right to trespass, TMS argues that,

because it did not do the actual trespassing, Ms. Davis's claim should be dismissed. TMS Mem.

at 9. But, as Ms. Davis alleged, TMS admitted it was responsible for all the trespasses at issue,

and "refused to do anything differently" in response to her complaints. Compl. ¶ 36; *see also id.*

at ¶ 40 (TMS confirmed the strangers were at her house on its behalf). These allegations that

TMS admitted to actual authority are sufficient on their own to merit denial of TMS's motion.

In general, of course, a principal is vicariously liable for the acts of its agent committed

during the course of that agency. An agency relationship exists if there is an understanding

between the parties to the relationship that the principal controls the undertaking of the agent. *Wesley v. Schaller Subaru, Inc.*, 277 Conn. 526, 543-44 (2006).

Ms. Davis provided extensive detail about the high degree of control TMS exercised over SLFS and MMC and, in turn, its responsibility for the trespasses at issue:

- SLFS and MMC acted as TMS's agents for the property inspections. *Id.* at ¶¶ 12, 23.

- TMS subjected SLFS to an extensive set of requirements and obligations and, in doing so, controlled SLFS's work. *Id.* at ¶ 26.

- TMS was subject itself to an explicit duty to supervise SLFS's and MMC's work per guidance from the CFPB. *Id.* at ¶ 29.

- TMS, SLFS, and MMC worked together to send their agents to the home. *Id.* at ¶¶ 38, 40.

Ms. Davis therefore sufficiently alleged facts giving rise to a principal-agency relationship that ran from TMS as principal down to each agent who individually entered Ms. Davis's property.

Furthermore, where the conduct at issue involves trespass, a principal like TMS can be held liable for the torts of parties not on its payroll, like independent contractors or other downstream actors like MMC. *Halkiotis v. WMC Mortg. Corp.*, *supra*, 144 F. Supp. 3d at 364.

TMS lastly asserts that it can only be held liable for the physical damage to Ms. Davis's garage door and, implicitly, not for the emotional damages she alleged from the trespasses. This argument is not supported by citation and, indeed, cannot be supported as emotional damages are recoverable through a claim for trespass. *See*, *e.g.*, *Briarwood of Silvermine, LLC v. Yew Street Partners, LLC*, 2019 WL 5431403, at *2 (Conn. Super. Ct., Oct. 4, 2019).

Defendants' arguments about their rights to enter Ms. Davis's property and the scope of their individual liability all fail. Ms. Davis's trespass claims against both should stand.

**IV.    Defendants Are Liable for the Conduct of Both Their Employees and the People They Repeatedly Sent to Enter Ms. Davis's Property.**

    A.    Applicable Legal Standard when the Conduct Involves a Trespass.

19

Ms. Davis asserted negligent supervision claims against both TMS and SLFS based on their failure to properly supervise all their agents who came onto her property. A claim for negligent supervision involves the usual elements of negligence: duty, breach of that duty, causation, and actual damages. *Murdock v. Croughwell*, 268 Conn. 559, 566 (2004).

A duty can arise out of a contract between two parties, as in the situation between TMS and Ms. Davis. Even in the absence of a contractual relationship, a defendant owes a duty of care "when (1) the defendant should have foreseen the likelihood of harm occurring in the absence of due care, and (2) public policy supports the imposition of legal responsibility." *Norboe v. Wells Fargo Bank, N.A*, *supra*, 2018 WL 1137575 at \*17, *citing Munn v. Hotchkiss School*, 326 Conn. 540, 548–49 (2017) and *Ruiz v. Victory Properties, LLC,* 315 Conn. 320, 328–29 (2015). The Restatement of Torts imposes a duty of care whenever the conduct will involve a trespass onto real property, a trespass occurs, and a harm results of the trespass. Restatement (Third) of Torts: Phys. & Emot. Harm § 61 (2012); Restatement (Second) of Torts § 427B (1965); *see also Halkiotis v. WMC Mortg. Corp.*, *supra*, 144 F. Supp. 3d at 364 (D. Conn. 2015).

A principal can be liable for negligent supervision of its non-employee agents and even independent contractors based on "improper performance of property preservation activities/ services more generally, including the failure to prevent wrongful entries onto plaintiff's property and into his home, and the failure to adequately instruct and monitor its agents, which plaintiff alleges led to the wrongful entries and trespasses onto plaintiff's property." *Norboe v. Wells Fargo Bank, N.A.*, *supra*, 2018 WL 1137575, \*17 (internal citations omitted); *see also Doe v. St. Francis Hosp. & Med. Ctr.*, 309 Conn. 146, n.29 (2013) (negligent supervision claim "would have been available to the plaintiff whether [the employee] had participated in the study as an employee, an independent contractor or merely as an unpaid volunteer").

Furthermore, a principal may be liable for the conduct of its independent contractor where the duty is nondelegable. There, while an employer may contract out the performance of its nondelegable duty, but may not contract out its ultimate legal responsibility. *Sola v. Wal–Mart Stores, Inc.*, 152 Conn. App. 732, 742–43 (2014), *cert. denied*, 314 Conn. 941 (2014) (footnote, internal quotation marks, citations, and brackets omitted). "Nondelegable duties generally are imposed, most often by statute, contract or common law, in recognition of 'the policy judgment that certain obligations are of such importance that employers should not be able to escape merely by hiring others to perform them.' 41 Am.Jur.2d, *Independent Contractors* § 43, p. 518 (2005)." *Machado v. City of Hartford*, 292 Conn. 364, 371–72 (2009).

B. Defendants Can be Held Liable for Negligent Supervision.

In addition to the facts regarding the inspections recited *supra*, Ms. Davis lodged a series of allegations regarding TMS and SLFS's duties to supervise their agents, to wit:

- Given such factors as the sensitive nature of the work, including the intrusions upon seclusion and invasions of privacy such work entails, TMS and SLFS knew or should have known – *i.e.*, it was foreseeable – that property inspection involved an unreasonable risk of causing emotional distress to Ms. Davis. Compl., ¶¶ 85, 87.

- TMS and SLFS each had a non-delegable duty to Ms. Davis to properly supervise their agents in the course of their duties, including but not limited to, their entry into Ms. Davis's property, their hiring and retention practices with respect to the individuals assigned to perform such work, their compliance with the Fair Housing Act, and their handling of complaints from customers like Ms. Davis regarding property inspection practices. Such agents include all the strangers sent to Ms. Davis's home. *Id*. at ¶¶ 86, 88.

Furthermore, by imposing extensive requirements regarding the manner and methods to be used when performing this work, TMS and SLFS sought to exercise a degree of control that rendered MMC and the individual property inspectors their agents. *Id.* at ¶¶ 26-28.

The CFPB bulletin referenced by Ms. Davis, instructing servicers like TMS to closely supervise companies like SLFS and MMC, is evidence of the public policy supporting a duty by mortgage servicers like TMS to supervise agents like SLFS and the property inspectors. *See*

Compl. ¶ 29. Moreover, given the public policy interests involved in protecting people in their own homes from intrusion and harassment, reflected in common-law doctrines like invasion of privacy and trespass, statutory prohibitions on landlords engaging in self-help and mortgagees from asserting a possessory interest in property till after a judgment of foreclosure has entered (*see* Conn. Gen. Stat. § 49-22), and even constitutional provisions like the Fourth Amendment, the deliberate and numerous intrusions here are enough to determine that the duty at issue – to supervise the people who repeatedly entered Ms. Davis's property on behalf of each Defendant – not only should be imposed, but that it should be considered to be nondelegable. Compl. ¶ 86; *cf. Norboe v. Wells Fargo Bank, N.A.*, *supra*, 2018 WL 1137575, *6-7 (in which then-Judge Ecker discusses but does not reach a conclusion as to whether this duty is nondelegable). Furthermore, the mortgage covenants cited by TMS and discussed *supra* expressly limit the right to conduct the activities at issue to the "Lender"; given this plain text, only the TMS or its agent could ever assert a right to engage in those activities. Claims by TMS and SLFS that they sent people to Ms. Davis's property but who were somehow not their agents would therefore be unlawful.

Ms. Davis also alleged that, once alerted to her interactions with their agents, TMS refused to do anything differently, Compl. ¶ 36; TMS and SLFS refused to reprimand, discipline, or otherwise alter their relationship with the property inspectors, *id.* at ¶ 38; TMS and SLFS failed to investigate her allegations, *id.*; TMS was dismissive of what Ms. Davis reported, *id.* at ¶ 40; inspections by Defendants have continued; *id.* at ¶ 43; and that her interactions with TMS and SLFS are consistent with how they handle similar complaints. *Id.* at ¶ 48.

Ms. Davis completed her claim by alleging that TMS and SLFS's breach of their duty to supervise their agents led to the foreseeable damages at issue. *Id*. at ¶¶ 88, 89.

22

C.  Defendants' Arguments Fail to Address the Facts of this Case and Fail to Abide by the Standards Applicable to Rule 12(b)(6) Motions.

Defendants' arguments regarding negligent supervision are rather limited. TMS focuses largely on the general notion that a principal is not liable for the torts of its independent contractors and the non-binding nature of the CFPB bulletin. TMS Mem. at 9-11. In doing so, TMS fails to grapple with the special nature of trespass, the allegations regarding the fact that its inspectors acted as its agents, and the fact that the bulletin is evidence of a broader public policy. TMS also repeatedly ratified the actions of its agents in its conversations with Ms. Davis. *See, e.g.,* Compl. ¶¶ 36, 40. TMS also tries to dispute Ms. Davis's allegations with a claim that it did not "set the standard or control the matter in which [SLFS] performs the work." TMS Mem. at 10. This assertion fails to accept Ms. Davis's allegations regarding TMS's control over SLFS's work as true, *see* Compl. ¶¶ 26-28, and is therefore inappropriate for a 12(b)(6) motion.

SLFS's argument is focused on whether it should have been aware of the racist[3] tendencies of the property inspectors it used. SLFS Mem. at 10-12. Ms. Davis's allegations plainly cover what SLFS itself, through its employees and agents, did wrong. Ms. Davis alleged that SLFS failed to instruct its agents in connection with their duties when performing property inspections, which include but are not limited to compliance with the Fair Housing Act. Compl. ¶ 88. She also alleges that SLFS failed to supervise those agents, including after Ms. Davis complained repeatedly about their conduct, and failed to take any action with respect to those agents or investigate her complaints. *Id.* at ¶ 38.

Because no argument holds any water given the facts actually alleged in her Complaint, Ms. Davis asks that Defendants' motions be denied with respect to negligent supervision.

---

[3] The n-word is not "racially insensitive." *See* SLFS Mem. at 2, 11, 14, 17.

V.      **TMS Violated the Real Estate Settlement Procedures Act by Failing to Acknowledge Ms. Davis's Request for a Forbearance in Her Qualified Written Request.**

A.  Background on RESPA and the Relevant Law.

RESPA protects consumers in the mortgage market and is broadly construed to accomplish this remedial purpose. *See Friedman v. Maspeth Fed. Loan & Sav. Ass'n*, 30 F. Supp. 3d 183, 187 (E.D.N.Y. 2014). Regulation X, issued pursuant to RESPA, provides, *inter alia*, procedures for a customer complaint process known as a Notice of Error ("NOE"). A customer's NOE is a type of qualified written request per 12 U.S.C. § 2605(e) that requires their servicer to investigate or correct servicing errors identified by the borrower in the NOE. *See* 12 C.F.R. § 1024.35. Violations of these regulations, and RESPA itself, may be privately enforced. *See* 12 U.S.C. § 2605(f).

The servicer must respond to an NOE within thirty business days of receipt by either (1) correcting the error and providing a written notification of the correction or (2) "conducting a reasonable investigation" of the alleged errors and then "providing the borrower with a written notification that the servicer has determined that no error occurred, a statement of the reason or reasons for this determination," and certain other information, including the right to request the documents the servicer relied on in making this determination. 12 C.F.R. § 1024.35(e)(1). Numerous courts have also concluded that a failure to uncover an error is evidence that the defendant failed to conduct a reasonable investigation. *See*, *e.g.*, *Wirtz v. Specialized Loan Servicing, LLC*, 886 F.3d 713 (8th Cir. 2018); *Weber v. Seterus*, No. 16 C 6620, 2018 WL 1519163, at *9 (N.D. Ill. Mar. 28, 2018); *McGahey v. Fannie Mae*, 266 F. Supp. 3d 421, 440 (D. Me. 2017).

A plaintiff may recover statutory damages under RESPA if she can establish "a pattern or practice of noncompliance" with RESPA. 12 U.S.C. § 2605(f)(1). "[A] pattern or practice of

noncompliance requires more than one alleged violation of RESPA," *Herrera v. Cent. Loan Admin. & Reporting, No. 17-4774*, 2017 WL 4548268, at *4 (D.N.J. Oct. 12, 2017), and involves "a standard or routine way of operating." *See Tanasi v. CitiMortgage,* 257 F. Supp. 3d 233, 272 (D. Conn. June 30, 2017), *quoting Gorbaty v. Wells Fargo Bank, N.A*., No. 10-CV-3291 NGG SMG, 2012 WL 1372260, at *5 (E.D.N.Y. Apr. 18, 2012). Courts vary on the number RESPA violations that a borrower must plead, generally requiring at least two or three. *See Tanasi*, 257 F. Supp. 3d at 272 (collecting cases). Plaintiffs may also rely on other borrowers' complaints in the CFPB database or other cases for RESPA violations to plead a pattern or practice of violating RESPA. *Id.* at 272 (statutory damages sufficiently alleged based on number of CFPB complaints for § 1024.41 violations and two other cases involving § 1024.35 violations).

     B.  <u>TMS Violated RESPA in Multiple Ways.</u>

     Ms. Davis's allegations in her RESPA count covers its handling of her qualified written request relative to RESPA and Regulation X. She identified a servicing error – TMS's failure to comply with the CARES Act and FHA rules in providing her with misinformation regarding the availability of a forbearance – and requested that it be corrected by issuing her a CARES Act forbearance. Compl. ¶ 66. TMS responded, not by correcting its error, but by ignoring her request for a forbearance, and limiting its investigation to a fact not in dispute: the FHA backing of her loan. Compl. ¶ 68; Docket Entry 40-2. The FHA backing of her loan is a fact so basic that it reflects far less than the required "reasonable investigation," especially when paired with no other accurate findings. Furthermore, TMS said a "special forbearance" was available, something less than what the CARES Act and the relevant FHA directives require. Docket Entry 40-3; Compl. ¶¶ 51, 53. Because it failed to correct its error, denied its error while providing more erroneous information, and limited its "thorough[] review" to a fact not in dispute, TMS violated

RESPA and Regulation X. 12 C.F.R. § 1024.35. Moreover, as a matter of law, TMS cannot obtain dismissal based on a bald assertion that its investigation was nevertheless reasonable and in light of its continuing failure to correct its error by providing Ms. Davis with a forbearance.

Ms. Davis further alleged that TMS's handling of her QWR was pattern or practice, alleging both that (a) it either lacks adequate procedures to respond to QWRs or failed to follow those procedures when handling Ms. Davis's QWR, Compl. ¶ 69, and (b) at least two other consumers have brought viable claims based on TMS's failure to properly respond to their QWR. Compl. ¶ 73. She also alleged that several consumers have filed CFPB complaints regarding TMS's handling of the CARES Act. *Id.* at ¶ 72. Because of these repeated violations of RESPA, she seeks statutory damages. Compl. Request for Relief, (b).

    C.  <u>TMS's Arguments Ignore the Actual Law and Ms. Davis's Pleadings.</u>

TMS's arguments regarding Ms. Davis's QWR range from unsupported to flatly wrong. TMS first claims that Ms. Davis's letter did not involve servicing of her loan, TMS Mem. at 11, even though she identified the TMS employees by name who gave her erroneous options about the workout options available to her and even though she requested a forbearance under the CARES Act, a request squarely within the category of loan servicing. This means her QWR was a notice of "error…[a] failure to provide accurate information to a borrower regarding loss mitigation options and foreclosure" under Regulation X, to wit, 12 CFR § 1024.35(b)(7). Ms. Davis's letter was an NOE that pertained to servicing as a matter of law.

TMS also argues its mention of a "COVID-19 related special forbearance plan" of 90 days, followed by either a lump sum payment or a enter a workout plan, was adequate. TMS Mem. at 12. But it was not accurate. The CARES Act contemplates a forbearance period of up to 180 days, renewable for up to 360 days, be offered. Compl. ¶¶ 51, 53. A "special forbearance" is

a different workout option under FHA rules, governed by a 2013 FHA Mortgagee Letter (ML 13-32) rather than the CARES Act. Telling Ms. Davis that she could only receive 90 days' "special forbearance" and then either (1) loan workout review or (2) a lump sum payment was false. Doubling down on this falsehood now does not cure TMS's violations of law.

TMS claims it nevertheless provided an adequate response to Ms. Davis's request for information (RFI) in her QWR. TMS Mem. at 12-13. But while Ms. Davis did include a separate RFI in her QWR, *see* Docket Entry 40-2, TMS's response to Ms. Davis's RFI is not the subject of her RESPA claim nor even explicitly referenced in her complaint.[4]

TMS also argues that its failure to provide a forbearance under the CARES Act is not remediable under RESPA, based on the rationale in *Canty v. Wells Fargo Bank, N.A.*, 463 F. Supp. 3d 57, 65 (D. Mass. 2020). The plaintiff there tried unsuccessfully to use RESPA to challenge the denials of several workout applications. Here Ms. Davis requested a CARES Act forbearance in her notice of error – something that the joint statement cited by TMS, TMS Mem. at 13, says requires only a request and a hardship affirmation[5] as Ms. Davis provided, to wit:

> My income has been adversely affected by the COVID-19 pandemic. **Please put my loan into forbearance immediately for 180 days.**

Docket No. 40-2. TMS was required to grant that request.[6] Unlike *Canty*, there was no exchange of financial documents nor document review nor underwriting typically associated with an

---

[4] For now. Since Ms. Davis did not receive the entirety of the purported response in Docket Entry 40-3 till the filing of TMS's first Rule 12 motion, she had not yet seen TMS's statements about its refusal to provide certain information.

[5] Working link here: https://files.consumerfinance.gov/f/documents/cfpb_interagency-statement_mortgage-servicing-rules-covid-19.pdf ("Joint Statement").

[6] "Servicers **must** provide a CARES Act forbearance if the borrower makes this request and affirms that the borrower is experiencing a financial hardship during the COVID-19 emergency.  Servicers **may not** require any additional information from the borrower before granting a CARES Act forbearance." Joint Statement at 3 (emphases in original).

"application." Nor was Ms. Davis challenging a denial of a workout or using her notice of error as an appeal of a denial. TMS was required to correct her account to put her in a forbearance, and yet egregiously failed to do so. Its error was failing to honor her request. And while the CARES Act may not explicitly provide for a private right of action, *see* TMS Mem. at 13, Ms. Davis is using other statutes to pursue a remedy for TMS's blatant CARES Act violations.

Lastly, in a footnote, TMS says that other borrowers' cases against it have no bearing on Ms. Davis's situation. TMS Mem. at 13 n.1. But because she seeks statutory damages under RESPA based on TMS's pattern and practice of noncompliance with RESPA, they are relevant. *See Tanasi, supra*, 257 F. Supp. 3d at 272.

TMS failed to adequately respond to Ms. Davis's QWR, handle her NOE, and muster viable arguments for dismissing her RESPA claim.

**VI.      Defendants Repeatedly Violated CUTPA.**

A.  Applicable Standard of Law

CUTPA is a broad remedial statute. *Artie's Auto Body v. Hartford Fire Ins. Co.*, 317 Conn. 602, 623 (2015). It may be used to remedy violations of a law, and the ascertainable loss suffered as a result, even when that law contains no private right of action, or even if the principles of the law were violated even if the law itself technically was not. *See, e.g., Eder Bros., Inc. v. Wine Merchants of Connecticut, Inc.*, 275 Conn. 363, 380-82 (2005).

For a baseline claim of unfair trade practices, the Connecticut Supreme Court has provided: "[W]e have adopted [certain] criteria set out in the cigarette rule by the [F]ederal [T]rade [C]ommission for determining when a practice is unfair: (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some [common-law], statutory, or other established concept of unfairness; (2)

whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [competitors or other businesspersons].... All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three... Thus a violation of CUTPA may be established by showing either an actual deceptive practice ... or a practice amounting to a violation of public policy." *Cenatiempo v. Bank of Am., N.A.*, 333 Conn. 769, 790 (2019) (footnote omitted; citations omitted; internal quotation marks omitted).

Furthermore, a practice is "deceptive" under CUTPA if each of the following is true: "First, there must be a representation, omission, or other practice likely to mislead consumers. Second, the consumers must interpret the message reasonably under the circumstances. Third, the misleading representation, omission, or practice must be material – that is, likely to affect the consumer's decisions or conduct." *Caldor, Inc. v. Helson*, 215 Conn. 590, 597 (1990) (internal quotation marks and citations omitted). "Thus, a violation of CUTPA may be established by showing either an actual deceptive practice . . . or a practice amounting to a violation of public policy." *Ramirez v. Health Net of the Northeast, Inc.*, 285 Conn. 1, 19 (2008).

"Once a violation of CUTPA has been established, evidence that the defendant has acted with reckless indifference to the rights of the plaintiff or has committed an intentional and wanton violation of those rights is a necessary prerequisite to the award of punitive damages." *Whitaker v. Taylor*, 99 Conn. App. 719, 733 (2007).

B.  <u>Ms. Davis's CUTPA Claims Are Based on Conduct Both Covered and Not by the Foregoing Claims.</u>

Ms. Davis alleged that TMS engaged in unfair trade practices with respect to its violations of the Fair Housing Act, its failure to follow federal law with respect to Ms. Davis's request for a forbearance (*i.e.*, the CARES Act, FHA rules, and RESPA), the manner by which it

handled her verbal and written complaints (*i.e.*, both her phone calls and her NOE), and its failure to train and supervise its employees and agents with respect to property inspections and their obligations under the Fair Housing Act. *See* Compl. ¶ 97. Moreover, beyond the allegations already discussed *supra* in the context of the foregoing claims, Ms. Davis alleged:

- TMS's compliance with the CARES Act and FHA rules is subject to monitoring by the federal government. Compl. ¶ 59.

- TMS was obligated to maintain policies and procedures pursuant to 12 C.F.R. § 1024.38 to provide timely and accurate information to borrowers and to investigate, respond to, and make corrections in response to borrower complaints. Compl. ¶ 61. And yet it did nothing to investigate or change how it conducted inspections, *id.* at ¶¶ 38, 43, 62, and it refused her request for a forbearance and provided her with false information. *Id.* at ¶ 63.

- TMS's policies per 12 C.F.R. § 1024.38 are either inadequate to protect consumers like Ms. Davis or were not followed with respect to Ms. Davis. *Id.* at ¶¶ 49, 64, 69.

Even though a plaintiff needs only one of the three prongs of the cigarette rule to plead an unfair trade practices claim, Ms. Davis's allegations satisfy all three. TMS and SLFS's conduct in repeatedly entering her property and subjecting her to abusive comments while refusing to change or even entertain her request to even schedule inspections, TMS's and SLFS's refusal to supervise their property inspectors, TMS's and SLFS's failure to train and supervise their employees' compliance with applicable law, TMS's failure to comply with 12 C.F.R. § 1024.38, TMS's failure to supervise SLFS and MMC while the latter two were engaged in work on behalf of TMS contrary to the CFPB bulletin, and TMS's conduct in ignoring its servicing obligations under the CARES Act, FHA rules, and RESPA all violate public policy. *See id*. at ¶ 99; *see also*, *Cenatiempo v. Bank of Am.*, *supra*, 333 Conn. at 791-92 (conscious decision by mortgage servicer to depart from federally-established industry norms violated CUTPA); *Norboe v. Wells Fargo Bank, N.A.*, *supra*, 2018 WL 1137575, at *15 (CUTPA prohibits "pattern of disregard and even indifference with respect to fundamental rights of privacy and homeownership protected by

well-established public policy"). Additionally, Ms. Davis pleaded that Defendants' conduct here was part of a larger pattern, a further violation of public policy.

Furthermore, Ms. Davis's allegations satisfy the second prong of the cigarette rule in that there is nothing ethical about, for instance, repeatedly subjecting a Black homeowner to racist remarks, subhuman treatment, and disregard for her complaints about intrusive and disturbing property inspections. There is nothing ethical about telling a Black homeowner that calling the police in response to this treatment by the inspectors will only lead to her being arrested. And there is nothing ethical about ignoring the federal vehicles for COVID-related mortgage relief.

Ms. Davis's allegations satisfy the third prong of the cigarette rule in that Defendants' actions caused a substantial injury: (1) an "ascertainable loss" via a broken garage door, improper fees, interest, and lost opportunity to obtain a loan workout, and (2) emotional damages. *See*, *e.g.*, Compl. ¶ 103.

Ms. Davis's allegations are not only sufficient for the sake of an unfair practices claim; they are enough to merit an award of punitive damages against TMS. For example, TMS refused to conduct property inspections any differently no matter how many times Ms. Davis explained the distress they caused her. TMS refused to grant her a forbearance despite her repeated requests over the phone and her notice of error. Because of TMS's reckless indifference to Ms. Davis's well-being and her desire to remain in her home, and because it intentionally continued its conduct despite being on notice of how Ms. Davis was being treated, punitive damages are warranted. *See Whitaker v. Taylor*, *supra*, 99 Conn. App. at 733; Compl. ¶¶ 109-11.

Ms. Davis also satisfied the standards for bringing a claim for deceptive trade practices against TMS under the *Caldor* framework in that she repeatedly sought information about obtaining a forbearance, was given misinformation about having to repay back all the forborne

31

amounts in a lump sum at the end of the forborne period, and did not obtain a forbearance as a result, causing her damages. *See, e.g.,* Compl. ¶¶ 106-107.

    C.  <u>Defendants' Arguments Ignore the Caselaw and Ms. Davis's Actual Pleadings.</u>

In arguing for dismissal of Ms. Davis's CUTPA claims, both Defendants argue that the CUTPA claims are only derivative of other counts. For TMS, this argument ignores all the other allegations not covered by those counts – such as TMS's refusal to comply with the CARES Act throughout 2020 (including its misrepresentations regarding forbearance options) beyond that addressed in her RESPA count, and its violation of 12 C.F.R. § 1024.38. Moreover, Defendants' argument is premised on the notion that their conduct must be sufficient to bring some other sort of claim in order to also violate CUTPA, an argument contrary to the caselaw. *See, e.g., Eder Bros., Inc. v. Wine Merchants of Connecticut, Inc.*, 275 Conn. 363, 380-82 (2005). Even if one accepted *arguendo* Defendants' premise, her incorporation of other valid counts only bolsters the public policy prong of her CUTPA claim.

TMS and SLFS each argue that Ms. Davis failed to allege an ascertainable loss. "An ascertainable loss is a loss that is capable of being discovered, observed or established.... The term loss necessarily encompasses a broader meaning than the term damage, and has been held synonymous with deprivation, detriment and injury.... To establish an ascertainable loss, a plaintiff is not required to prove actual damages of a specific dollar amount.... [A] loss is ascertainable if it is measurable even though the precise amount of the loss is not known." *Landmark Inv. Group, LLC v. CALCO Const. and Dev. Co.*, 318 Conn. 847, 882 (2015) (Citations omitted; internal quotation marks omitted.). TMS further argues that her allegations regarding improper fees and interest are "speculative."

Ms. Davis's allegations of loss are more than speculative and fit well within the broad category of "ascertainable loss." She alleged that TMS paid SLFS for each task completed on its behalf and that TMS charged her fees as a result of each time SLFS or its agents entered her property based on whatever SLFS charged, meaning that SLFS's activities cost her money. Compl. ¶ 24. These allegations regarding fees are enough to substantiate her claim for an ascertainable loss against each Defendant. Her CUTPA claim also incorporates her allegation that Defendants' agent broke her garage door, a sort of "loss that is capable of being discovered, observed, or established." *See* Compl. ¶ 33. Further, while each Defendant argues that a CUTPA plaintiff may not base their claim solely on emotional damages, citing to *Di Teresi v. Stamford Health Sys., Inc.*, 149 Conn. App. 502, 512 (2014), the Connecticut Supreme Court has provided that emotional damages may be recovered in addition to whatever else the plaintiff alleges is an ascertainable loss. *See generally, Cenatiempo v. Bank of Am., N.A., supra*, 333 Conn 769. Given that she satisfied the standard for ascertainable loss with allegations about her broken garage door and improper fees, Compl. ¶ 103, she may also seek recovery of emotional damages.

For TMS, Ms. Davis explained that a borrower in a forbearance is charged fewer fees than a borrower not in forbearance. *Id.* at ¶ 54. And she alleged that, as a result of not being granted that forbearance, she was charged improper fees and suffered from a lost opportunity to obtain a workout. *Id.* at ¶ 70; *see also Cenatiempo*, 333 Conn. at 803 (plaintiffs' claims of inflated principal balance and lost opportunity sufficient for CUTPA).

Each Defendant seeks to avoid punitive damages under CUTPA. TMS suggests that it could fashion an excuse for its "error" in failing to comply with federal law. TMS Mem. at 16-17. This argument ignores that TMS filed a 12(b)(6) motion, not an answer with an affirmative defense, and that Ms. Davis's claims are based on far more than TMS's inability to comply with

the CARES Act and the FHA rules. SLFS's argument for avoiding liability is better, in that Ms. Davis is not seeking punitive damages from against SLFS under CUTPA. Compl. Count VII.

Defendants' arguments for avoiding CUTPA liability fail because they fail to engage with all that is at issue in the CUTPA counts.

## VII.   This Action, with its Three Defendants and Claims for Damages, Should Continue.

TMS's request in the alternative for dismissal based on abstention or a stay based on a prior pending action in Superior Court should be denied. Abstention is not available. In her request for relief, Ms. Davis seeks damages, attorney fees, and costs. Compl., Request for Relief. Because she is requesting these forms of relief, abstention per *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976) – the only conceivably applicable abstention doctrine – is not available for TMS. *See Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 731 (1996) ("federal courts have the power to dismiss or remand cases based on abstention principles only where the relief being sought is equitable or otherwise discretionary").

Nor is a stay appropriate for any other reason. First, the prior pending doctrine invoked by TMS applies to situations where there are two federal actions, not here where one of the two actions is a state case. *Cupe v. Lantz*, 470 F. Supp. 2d 128, 132 (D. Conn. 2007). Nor does the doctrine apply to situations like this one when the federal court has jurisdiction based on federal claims, and there is no federal claim in the state action. *Id.*; *see also AM Broadband, LLC v. First Fin. Ins. Co.*, No. 3:08-cv-378 (CFD), 2009 WL 353493 (D. Conn. Feb. 10, 2009).

Second, neither of the other two defendants are parties to the foreclosure action, and state court's impleader rules are limited to parties that are liable to the plaintiff (in state court, TMS) based on its claim against the defendant (in state court, Davis), meaning that Ms. Davis could not implead the others as counterclaim defendants (contra third-party defendants). Conn. Practice

Book § 10-11. Further, a determination on whether TMS has unclean hands for its own conduct, Ms. Davis's special defense, does not require the other Defendants' participation.

Moreover, a conflicting judgment is unlikely because TMS is currently barred by federal law from seeking judgment in state court by virtue of (1) Ms. Davis's aforementioned (and somehow still pending) request for a forbearance on her FHA-backed loan and the pause on foreclosure proceedings such a forbearance would entail, *see* Compl., ¶¶ 50-56, and (2) a repeatedly extended federal foreclosure moratorium. The latter is now in effect till June 30. Even if the FHA does not extend it, the CFPB has proposed what is functionally an extension till the end of 2021.[7]

**WHEREFORE**, Ms. Davis requests that the Court deny Defendants' motions.

Plaintiff Paulette Davis

/s/ Jeffrey Gentes
Jeffrey Gentes (ct28561)
Connecticut Fair Housing Center
60 Popieluszko Court
Hartford, CT  06106
860-263-0741
jgentes@ctfairhousing.org

---

[7] https://files.consumerfinance.gov/f/documents/cfpb_mortgage-servicing_nprm_2021-04.pdf