UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| PAULETTE DAVIS, | : |
|    Plaintiff, | : |
| | : |
| v. | : CASE No. 3:21-CV-00047 (AWT) |
| | : |
| THE MONEY SOURCE INC. and | : |
| SERVICELINK FIELD SERVICES, LLC | : |
| and MMC CONTRACTING SERVICES | : |
| INC. | : |
|    Defendants. | : |

**RULING ON THE DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT AND/OR STAY THE ACTION**

Plaintiff Paulette Davis ("Davis") has filed a First Amended Complaint against defendants The Money Source Inc. ("TMS"), ServiceLink Field Services, LLC ("SLFS"), and MMC Contracting Services Inc. ("MMC"), bringing claims for violations of the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601 *et seq*., trespass, negligent supervision of employees, violation of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2605(e) and 12 C.F.R. §§ 1024.35, and violations of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. §§ 42-110a et seq. TMS and SLFS have filed motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) or, in the alternate, to stay the case pending resolution of a state court foreclosure action. For the reasons set forth below, their motions are being denied except with respect to the claim in Count I based on 42 U.S.C. §3604(c).

-1-

## I.    FACTUAL ALLEGATIONS

"The complaint, which [the court] must accept as true for purposes of testing its sufficiency, alleges the following circumstances." Monsky v. Moraghan, 127 F.3d 243, 244 (2d Cir. 1997).

Davis is a Black resident of Waterbury, Connecticut. Prior to living in Waterbury, Davis was living in Bridgeport but wanted to move closer to her then-job in Washington, Connecticut. On the day she was to close on her new home in Waterbury, Davis was laid off from her job. Davis decided to go through with the closing because she knew that she had a great track record of employment, and because she would lose her $5,000 deposit if she did not close. "At all times relevant to [the] Complaint, TMS owned and serviced Ms. Davis's FHA-backed mortgage on her home, and SLFS and MMC performed property inspections on behalf of TMS, as TMS's agents, on Ms. Davis's home." First Amended Complaint (ECF No. 25) ("FAC") at ¶12.

Davis had trouble obtaining consistent income, was abandoned by her husband, and ultimately fell behind on her Federal Housing Administration-backed mortgage. Davis did what she could to improve her career and income opportunities, including attending nursing school, which she quit at the guidance of TMS. She worked as a housekeeper, took in an international student, and provided in-home care in her own home

to an elderly individual in an effort to make money. Despite these efforts, Davis was behind on her mortgage and feared that she would be forced to leave her home. During this time, Davis stayed in contact with TMS in hopes of obtaining a loan workout.

Shortly after Davis fell behind on her mortgage, TMS directed SLFS to send strangers to enter and inspect the property on its behalf. TMS paid SLFS an agreed-upon amount for each task and subsequently charged Davis for the amounts that it paid to SLFS. In turn, SLFS contracted with MMC for an agreed-upon amount per task to actually conduct the inspections. TMS provided SLFS with a set of requirements and obligations under which it was to conduct its "field services" work, including strict deadlines, hiring requirements, communications with TMS and its customers, and access to TMS's customers' confidential information. FAC at ¶ 26. SLFS then hired MMC to perform the "field services" with the same requirements. Id. at ¶ 27. MMC hired the individuals who performed the inspections, subjecting them to the same requirements.

The Consumer Financial Protection Bureau ("CFPB") issued a bulletin regarding mortgage servicers on October 31, 2016. That bulletin obligated TMS to supervise "service providers," like SLFS and MMC, and include in the contract with the service providers clear expectations about compliance, as well as enforceable consequences, internal controls and monitoring to

ensure compliance. It also obligated TMS to take prompt action to address any problems identified through the monitoring process, including termination of the relationship where appropriate.

In early 2019, Davis was home alone when she saw a young man walking around outside her home. She rapped on the window and shouted to the man "you shouldn't be doing that," and the man scurried away. Id. at ¶ 31. A month or two later, Davis saw another man on her property, peering through her windows. Davis went outside to ask the man what he was doing. The man got annoyed and responded: "I don't know why you're here. Go back to Bridgeport. I don't know where all you n----rs are coming from. This is not your house." Id. at ¶ 32. The man also pointed to the "No Trespassing" sign that was on the golf course just beyond Davis's property line and stated that the sign was there because the country club was concerned that she and her family would try to rob the golfers. Before the man left, he attempted to forcibly open Davis's garage door and, in the process, broke it. After this interaction, Davis called TMS to complain. TMS confirmed that it was sending inspectors to her property and stated that it had to do so because she was behind on her mortgage payments. TMS refused to do anything differently.

A few months later, a different inspector entered Davis's property and she confronted him. Davis asked if this individual

intended to damage her property like the previous inspector. He responded that he did not blame the previous inspector because he may have thought that Davis was at the property stealing copper rather than living there, given the neighborhood and Davis's complexion.

The two previously mentioned inspectors, as well as others, continued to appear during the first part of each month for inspections. These people would often ignore Davis's presence, and one gave her the middle finger. Davis contacted TMS many times to complain about strangers, as she was worried about them looking into her windows and scaring her underage grandson. Davis offered to set up regular appointments for the inspections, but TMS refused to accept the offer. In or around February 2020, Davis told TMS that she would call the police on any future intruder, and TMS advised her that such a call would only lead to her being arrested.

On or about June 1, 2020, another stranger drove up to Davis's property and pointed something at her which she believed looked like a gun, but turned out to be a camera. Davis was terrified and no longer feels safe in her own home. She lives in constant fear of having to confront another stranger on her property and worries that the situation will escalate to something more serious than a broken garage door.

Under the CARES Act, Davis was eligible to receive a forbearance because she had a federally-backed loan. <u>See</u> Coronavirus, Aid, Relief, and Economic Security Act, Pub. L. No. 116-136 §4022(b)(1), 134 Stat. 281, 490 (2020). She repeatedly requested a forbearance from TMS over the phone and in writing, but her request was denied each time. Three TMS employees told Davis over the phone that, even if she received a forbearance, she would have to make up any missed payments by making a lump sum payment at the end of the forbearance period. This information was incorrect, and such a requirement is actually prohibited by the FHA.

Davis also sent TMS a qualified written request and notice of error under RESPA on September 4, 2020. In it, she specifically disputed the information that the TMS employees had given her regarding a lump sum payment, and she reiterated her request for a forbearance pursuant to the CARES Act. TMS ignored Davis's request for a forbearance, conducted no investigation, and did not provide any response regarding the erroneous information she had been given by TMS employees.

In the past three years, at least eleven borrowers have complained to the CFPB about poor servicing when they applied for a loan workout from TMS, five customers have complained since the implementation of the CARES Act about TMS's failure to fulfill its obligations, and at least two others have brought

claims against TMS based on its failure to comply with its obligations under RESPA and Regulation X.

Davis now faces loss of the opportunity to keep her home, increased costs and fees, and potential foreclosure and eviction as a result of TMS's refusal to grant her a forbearance. TMS has initiated a state foreclosure action against Davis, which is currently pending.

## II.  LEGAL STANDARD

When deciding a motion to dismiss under Rule 12(b)(6), the court must accept as true all factual allegations in the complaint and must draw inferences in a light most favorable to the plaintiff. Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). Although a complaint "does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atlantic Corp. v. Twombly, 550 U.S. 550, 555 (2007) (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation"). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 557). "Factual allegations must be enough to raise a right to

relief above the speculative level, on the assumption that all
the allegations in the complaint are true (even if doubtful in
fact)." Twombly, 550 U.S. at 555 (internal citations and
quotations omitted). However, the plaintiff must plead "only
enough facts to state a claim to relief that is plausible on its
face." Id. at 547. "A claim has facial plausibility when the
[claimant] pleads factual content that allows the court to draw
the reasonable inference that the defendant is liable for the
misconduct alleged." Iqbal, 556 U.S. at 678. "The function of a
motion to dismiss is 'merely to assess the legal feasibility of
the complaint, not to assay the weight of the evidence which
might be offered in support thereof.'" Mytych v. May Dep't
Store Co., 34 F. Supp. 2d 130, 131 (D. Conn. 1999) (quoting
Ryder Energy Distribution v. Merrill Lynch Commodities, Inc.,
748 F.2d 774, 779 (2d Cir. 1984)). "The issue on a motion to
dismiss is not whether the plaintiff will prevail, but whether
the plaintiff is entitled to offer evidence to support his
claims." United States v. Yale New Haven Hosp., 727 F. Supp.
784, 786 (D. Conn. 1990) (citing Scheuer, 416 U.S. at 232).

In its review of a motion to dismiss for failure to state a
claim, the court may consider "only the facts alleged in the
pleadings, documents attached as exhibits or incorporated by
reference in the pleadings and matters of which judicial notice
may be taken." Samuels v. Air Transport Local 504, 992 F.2d 12,

15 (2d Cir. 1993). "[I]n some cases, a document not expressly incorporated by reference in the complaint is nevertheless 'integral' to the complaint and, accordingly, a fair object of consideration on a motion to dismiss. A document is integral to the complaint 'where the complaint relies heavily upon its terms and effect.'" Goel v. Bunge, Ltd., 820 F.3d 554, 559 (2d Cir. 2016) (quoting Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002)).

**III. DISCUSSION**

The First Amended Complaint has seven counts. Count I is a claim that the three defendants violated four provisions of the Fair Housing Act, 42 U.S.C. §3604(b), §3604(c), §3605, and §3617. Count II and Count III are claims against all three defendants for trespass and negligent supervision, respectively. Count IV is a claim against TMS for violation of RESPA. Count V is a CUTPA claim against all three defendants claiming unfair practices. Count VI is a CUTPA claim against TMS only claiming deceptive practices, and Count VII is a CUPTA claim against TMS only alleging intentional or reckless practices. TMS and SLFS each seek dismissal of all claims against them. TMS moves in the alternative to stay the case pending resolution of its state foreclosure action against Davis.

### A. Fair Housing Act

Count I claims violations of 42 U.S.C. §3604(b), §3604(c), §3605 and §3617. TMS argues that Davis has failed to state a claim under §3604(b) and §3604(c). SLFS argues that Davis has failed to state a claim under any of these sections.

### 1. Section 3604(b)

Section 3604(b) prohibits discrimination "against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race . . . ." 42 U.S.C. §3604(b).

Davis claims that the defendants violated this section by (a) attempting to forcefully open her garage door because she is Black, and in the process, damaging it, (b) repeatedly subjecting her to discriminatory statements based on her race, (c) failing to take her complaints about discriminatory treatment seriously, and (d) failing to provide proper training to their employees and agents about their obligations under the FHA. See FAC ¶¶ 75-79. TMS argues that §3604(b) does not apply to Davis because she had already acquired her home at the time of the events at issue and thus there was no sale or rental of property at any time relevant to her claims.

In Francis v. Kings Park Manor, 992 F.3d 67 (2d Cir. 2021) (en banc), the court upheld dismissal of a case in which the

plaintiff sought to hold his landlord liable for the
discriminatory acts of another tenant. Because the plaintiff
failed to allege intentional discrimination, the court declined
to "consider to what extent the FHA's prohibition of
discrimination reaches conduct engaged in after the tenant
acquires a dwelling." Id. at n.50. The majority opinion noted
that the panel had split on this question. See id. ("Compare
Francis I, 944 F.3d at 377 (concluding that the FHA forbids
conduct that "would constitute discrimination in the enjoyment
of residence in a dwelling or in the provision of services
associated with that dwelling after acquisition" (Internal
quotation marks omitted)), with id. at 387-89 (Livingston, J.,
dissenting) (noting holdings of courts of appeals limiting the
post-acquisition reach of the FHA to conduct constituting
constructive eviction)"). Judge Lohier, concurring in part and
dissenting in part and joined by four other judges, stated,
"Instead of merely assuming the FHA applies to post-acquisition
conduct, I would squarely hold that it does." Id. at 87. Judge
Lohier explained:

> First, the text of the FHA plainly provides for
> coverage of post-acquisition conduct. Section 3604(b)
> prohibits discrimination in the "terms, conditions, or
> privileges of sale or rental of a dwelling, or in the
> provision of services or facilities in connection
> therewith." 42 U.S.C. § 3604(b). The words
> "conditions," "privileges," and "provisions of
> services or facilities" refer not just to the sale or
> rental itself, but to benefits and protections

following the sale or rental. See Bloch v. Frischholz, 587 F.3d 771, 779-80 (7th Cir. 2009) (en banc); see also Comm. Concerning Cmty. Improvement v. City of Modesto, 583 F.3d 690, 713 (9th Cir. 2009). As the United States asserted at oral argument in this case, "by definition, a rental creates an ongoing legal relationship between a landlord and a tenant for a term, [and] phrases like 'terms, conditions, or privileges' need to be interpreted using the ordinary plain language." Oral Arg. Tr. at 35:18-21.

Second, the plain language of § 3617 creates a separate cause of action that more comprehensively prohibits post-acquisition discriminatory conduct barred by § 3604(b). Section 3617 makes it "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section ... 3604." 42 U.S.C. § 3617. As the Seventh Circuit observed, "[c]oercion, intimidation, threats, or interference with or on account of a person's exercise of his or her [§ 3604(b)] rights can be distinct from outright violations of [§ 3604(b)]." Bloch, 587 F.3d at 782.

Third, any contrary interpretations of §§ 3604(b) and 3617 would contravene Congress's central intent to use the FHA to root out discrimination in housing. See Cabrera v. Jakabovitz, 24 F.3d 372, 390 (2d Cir. 1994) (rejecting a defendant's "crabbed reading" of the FHA for failing to comport with the statute's "broad legislative plan to eliminate all traces of discrimination within the housing field" (quotation marks omitted)).

Finally, all seven sister circuits that have addressed the issue have acknowledged that § 3604(b) prohibits at least some post-acquisition conduct. Cox v. City of Dallas, 430 F.3d 734, 746 (5th Cir. 2005); see Bloch, 587 F.3d at 772; Modesto, 583 F.3d at 714; Ga. State Conf. of the NAACP v. City of LaGrange, 940 F.3d 627, 631-33 (11th Cir. 2019); Honce v. Vigil, 1 F.3d 1085, 1088-90 (10th Cir. 1993); Betsey v. Turtle Creek Assocs., 736 F.2d 983, 985-86 (4th Cir. 1984); see also Mich. Prot. & Advoc. Serv., Inc. v. Babin, 18

F.3d 337, 347 (6th Cir. 1994); Brief for Debo Adegbile
as Amicus Curiae Supporting Plaintiff-Appellant at 10–
15 (describing the uniform view of "all circuit courts
to have considered the issue" that the FHA bars post-
acquisition discriminatory conduct).

Francis, 992 F.3d at 88-89. Also, in Viens v. American Empire

Surplus Lines Insurance Co., 113 F. Supp. 3d. 555, 569 (D. Conn

2015), the court concluded that the "words 'privileges' and

'services or facilities' in the statutes connote continuing

rights beyond the acquisition of housing."

Just as the rental of a dwelling creates an ongoing legal

relationship between a tenant and a landlord, a mortgage creates

an ongoing relationship between a mortgagor and the holder of

the mortgage for the term of the mortgage loan. The words

"privileges of sale" and "provisions of services or facilities

in connection therewith" connote that the protections afforded

by §3604(b) do not expire upon the closing of the sale but

continue throughout the course of the ongoing relationship.

While TMS argues that, in Francis, the Second Circuit "walked

back the scope of the FHA," that is not so. The court simply

concluded that "a landlord cannot be presumed to have a degree

of control over tenants necessary to impose liability under the

FHA for tenant-on-tenant discriminatory conduct," 992 F.3d at

70, and declined to address the scope of the FHA's applicability

to post-acquisition conduct. This court finds persuasive the

analysis in Judge Lohier's opinion.

Relying on Bloch v. Frischholz, 587 F.3d 771, 779 (2009),
SLFS argues that Davis has failed to state a plausible claim for
violation of §3604(b). SLFS contends that the alleged
discrimination did not involve the "terms, conditions, or
privileges of sale or rental of a dwelling" or the "provision of
services or facilities in connection therewith" because the
plaintiff has not alleged "any facts sufficient to establish
that SLFS's conduct has rendered her housing 'unavailable.'"
SLFS Mem. of Law (ECF No. 41-1) ("SLFS Mem.") at 6. But Bloch
was relied on by Judge Lohier in his analysis in Francis. This
is because Bloch recognized that the FHA can reach certain
claims of post-acquisition discrimination. See Bloch, 587 F.3d
at 772. In discussing §3604(b), the court stated: "[T]he
defendants rely on [Halprin v. Prairie Single Family Homes of
Dearborn Park Ass'n, 388 F.3d 327 (7th Cir. 2004)] to argue that
the FHA does not reach any claims of post-acquisition
discrimination." Id. at 779. The court then explained why the
defendants' reliance was misplaced:

> This contractual connection between the Blochs and the
> Board distinguished this case from Halprin. Halprin
> made it clear that §3604(b) is not broad enough to
> provide a blanket "privilege" to be free from all
> discrimination from any source. Plaintiffs generally
> cannot sue under §3604 for isolated acts of
> discrimination by other private property owners.
> Neither the FHA's text nor its legislative history
> indicates an intent to make "quarrels between
> neighbors… a routine basis for federal litigation."
> 388 F.3d at 329. As deplorable as it might have been,

the defendants' alleged conduct in Halprin was not
linked to any of the terms, conditions, or privileges
that accompanied or were related to the plaintiffs'
purchase of their property. But that's what §3604(b)
requires.

Id. at 780.

In Bloch, the plaintiffs "alleged discrimination by their
condo association, an entity by which the Blochs agreed to be
governed when they bought their units. This agreement, though
contemplating future, post-sale governance by the Association,
was nonetheless a term or condition of sale that brings this
case within §3604(b)." Id. at 779.

Here, there is also such a contractual connection between
the defendants' alleged conduct and the terms and conditions
that are related to Davis's purchase of the property. Davis
purchased her home using a mortgage loan that TMS services. It
was a condition of the loan that Davis mortgage her property
pursuant to an Open-End Mortgage Deed, which contained certain
Uniform Covenants. Those Uniform Covenants gave the defendants
certain rights and powers that could be exercised in connection
with servicing the plaintiff's mortgage loan. They included the
right to inspect Davis's property:

> 7. Preservation, Maintenance, and Protection of the
> Property; Inspections. . . . Lender of its agent may
> make reasonable entries upon and inspections of the
> Property. If it has reasonable cause, Lender may
> inspect the interior of the improvements on the
> Property. Lender shall give Borrower notice at the

-15-

time of or prior to such an interior inspection
specifying such reasonable cause.

Open-End Mortgage Deed (ECF No. 47-1), at ¶7.

Similar to the plaintiffs in <u>Bloch</u>, Davis has alleged that
she was discriminated against by TMS and its agents, SLFS and
MMC, in exercising rights and powers that they acquired vis-à-
vis her in connection with and as a condition of her purchase of
her home. Section 3604(b) prohibits discrimination in the
exercise of those rights and powers.

Because the FHA does apply to post-acquisition conduct
under the circumstances alleged here, Davis has stated a claim
under §3604(b).

### 2. Section 3604(c)

Section 3604(c) makes it unlawful for individuals "[t]o
make, print, or publish, or cause to be made, printed, or
published any notice, statement, or advertisement, with respect
to the sale or rental of a dwelling that indicates any
preference, limitation, or discrimination based on race . . . ."
42 U.S.C. §3604(c).

Davis alleges that "[t]wo of the strangers sent by all
three Defendants to 'inspect' her home subjected her to
discriminatory statements in violation of 42 U.S.C. § 3604(c),
3605, and 3617 by indicating a dispreference for Black residents
like her in the city and neighborhood where she lives…" FAC ¶75.

The plaintiff also alleges, in ¶32 and ¶33 of the First Amended Complaint, that a man sent to her home by the defendants made specific, racially discriminatory, statements to her.

TMS and SLFS argue that Davis fails to state a claim because §3604(c) is only applicable to the sale or rental of a dwelling. They contend that this section is narrower than §3604(b) because it does not include the clause "or in the provision of services or facilities in connection therewith." The court agrees.

Relying on U.S. v. Space Hunters Inc., 429 F.3d 416 (2d Cir. 2005), the plaintiff argues that §3604(c) should be read broadly "and not limited to a particular sale or rental." Pl. Opp. to Def.'s Mot. to Dismiss (ECF No. 47)("Pl. Mem.") at 9. But the reference in that case to the language of this section applying broadly is not made in the context of interpreting the clause "with respect to the sale or rental of a dwelling", but rather, is made in the context of interpreting the clause "any notice, statement, or advertisement":

> In this case, the district court held that section 804(c)—specifically, the phrase "with respect to the sale or rental of a dwelling—applied only to dwelling owners or their agents. It reached this conclusion by relying on what it said to be the "purpose" of the statute: "to prevent expressions that result in the denial of housing, not to prevent all discriminatory expression." Because it found that defendants are neither owners nor agents and that applying section 804(c) to them "would not further the purpose of the

statute," the district court dismissed Claims Three and Seven. We disagree with this interpretation.

The district court's assessment of the "purpose" of section 804(c) is inconsistent with the statute's plain language, which applies broadly to "*any* notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates" a discriminatory preference on prohibited grounds. 42 U.S.C. § 3604(c) (emphasis added). Nothing in this language limits the statute's reach to owners or agents or to statements that directly effect a housing transaction. Indeed, this language does not provide any specific exemptions or designate the persons covered, but rather… applies on its face to anyone who makes prohibited statements. United States v. Hunter, 459 F.2d 205, 210 (4th Cir. 1992).

Id. at 424.

Thus, Space Hunters stands for the proposition that section 3604(c) applies broadly to anyone who makes a discriminatory statement with respect to the sale or rental of a dwelling. It does not support a conclusion that the statement is not required to be one that is with respect to the sale or rental of a dwelling.

Here, the facts alleged show that the statements at issue were not made with respect to the sale or rental of a dwelling. Thus, the motions to dismiss are being granted with respect to Count I to the extent that it is based on §3604(c).

### 3. Section 3605

Section 3605 makes it unlawful for "any person or other entity whose business includes engaging in residential real-estate related transactions to discriminate against any person

-18-

in making available such a transaction or in the terms or
conditions of such a transaction, because of race, color,
religion, sex, handicap, familial status, or national origin."
42 U.S.C. §3605(a). A "residential real estate-related
transaction" is defined as follows:

> As used in this section, the term "residential real
> estate-related transaction" means any of the
> following: (1) the making or purchasing of loans or
> providing other financial assistance-- (A) for
> purchasing, constructing, improving, repairing, or
> maintaining a dwelling; or (B) secured by residential
> real estate. (2) The selling, brokering, or appraising
> of residential real property.

42 U.S.C. §3605(b).

Citing to Johnson v. Citibank, 234 F.3d 1262 (2d Cir.
2000), SLFS argues that the plaintiff has failed to state a
claim under section 3605 because "[p]laintiff has not alleged,
nor can she, that (1) she attempted to engage in a real estate-
related transaction with SLFS and was qualified to do so, (2)
SLFS refused to transact business with her despite her
qualifications, or (3) that SLFS continued to engage in the type
of transaction in question with other parties with similar
qualifications." SLFS Mem. at 9. SLFS then asserts that "[t]here
exist no facts that Plaintiff can plead to support her claim
against SLFS under 3605 because SLFS does not engage in real
estate-related transactions." Id. SLFS takes the position that
the only real estate-related transaction here was the

"Plaintiff's application for, and obtaining of, her mortgage."
Id. See also id. ("SLFS had absolutely no involvement with
Plaintiff obtaining the mortgage and, was not engaged in a real
estate-related transaction."). However, SLFS is citing to the
elements for a claim under the part of §3605(a) that relates to
"making available such a transaction," while the plaintiff is
bringing her claim under the part of the statute that covers
discrimination "in the terms or conditions of such a
transaction."

In addition, the term "residential real estate-related
transaction" also encompasses more than the making of loans. It
includes the purchasing of loans or providing other financial
assistance. 42 U.S.C. 3605(b). If the term "residential real
estate-related transaction" were limited to the making of loans,
this additional language would not be included in the
definition. See National Fair Housing Alliance, Inc. v.
Prudential Insurance Co. of America, 208 F.Supp.2d 46, 58
(D.D.C. 2002).

Thus, the motion to dismiss is being denied as to § 3605.

### 4. Section 3617

Under §3617 "[i]t shall be unlawful to coerce, intimidate,
threaten or interfere with any person in the exercise or
enjoyment of, or on account of his having exercised or enjoyed,
or on account of his having aided or encouraged any other person

in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title." 42 U.S.C. §3617.

"In order to prevail on this type of §3617 claim, a plaintiff must show four things: (1) that she is a member of a group protected by the Fair Housing Act; (2) that she was engaged in the exercise or enjoyment of her fair housing rights; (3) that the defendant was motivated in part by an intent to discriminate, or his conduct produced a disparate impact; and (4) that the defendant interfered with plaintiff on account of her protected activities." Robert G. Schwemm, Housing Discrimination Law and Litigation §20:3 (2020). As the court explained in Stackhouse v. DeSitter:

> Section 3617 makes it "unlawful to coerce, intimidate, threaten, or interfere with any person" in three distinct circumstances: (1) in the exercise or enjoyment of any right protected by §§3603-3606; (2) on account of the person's having exercised or enjoyed such a right; and (3) on account of his having aided or encouraged any other person in the exercise or enjoyment of such a right. In the first situation, the prohibited coercive conduct might well interrupt the exercise of some enumerated right, resulting, in violations of both §3617 and another statutory section. In the second and third circumstances, however, the coercive or threatening conduct which violates §3617 occurs *after* the enumerated rights have been exercised, and these rights might not be violated themselves.

620 F. Supp. 208, 211 (N.D. Ill. 1985).

The plaintiff has accurately summarized the allegations in the First Amended Complaint that support this claim:

> Davis alleged that (1) she is a Black woman living in her own home, a protected activity, (2) Defendants, through their agents the property inspectors, were aware of that activity, (3) Defendants took adverse action in that an agent both intimidated and threatened her by telling her she and other Black residents in the area should move back to Bridgeport and broke her garage door, and (4) Defendants explicitly connected her race to their activity through the racist statements that the agent made. Those allegations cover all four elements of a section 3617 claim.

Pl. Mem. at 12.

SLFS and TMS (in its reply) argue that Davis suffered no adverse action, and SLFS further argues that no causal connection exists between protected activity and an adverse action. However, in making these arguments, the defendants cite to the elements for a §3617 claim discussed in Gilead Community Services Inc. v. Town of Cromwell, 432 F. Supp. 3d 46, 77 (D. Conn. 2019), which was a different type of §3617 claim.

SFLS argues that the plaintiff has not alleged that SLFS was aware that she engaged in a protected activity. The statute makes it illegal to intimidate, threaten or interfere with any person in the exercise or enjoyment of any right granted or protected by, inter alia, §3604(b), which prohibits discrimination "against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision

of services or facilities in connection therewith, because of race[,]" 42 U.S.C. 3604(b), and §3605, which makes it unlawful for "any person or other entity whose business includes engaging in residential real-estate related transactions to discriminate against any person in making available such a transaction or in the terms or conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin." 42 U.S.C. §3605(a). The plaintiff has alleged that she was exercising her rights protected by §3604(b) and §3605 and that SLFS, acting through its agent, interfered with her enjoyment of those rights. So SLFS was aware, through its agent, that she was engaged in protected activity.

SLFS also argues that "any adverse action taken against [p]laintiff was triggered by the instruction of TMS and carried out by MMC." SLFS Mem. at 11. However, the plaintiff has alleged facts supporting her position that here, "a principal may be vicariously liable for its agents' violations of the Fair Housing Act when agents act on its behalf, and because TMS itself, and the agents TMS and SLFS sent, all said they were working together on TMS's behalf, TMS and SLFS are vicariously liable for the treatment and statements to which Ms. Davis was subjected." Pl. Mem. at 12.

Thus, the motion to dismiss is being denied as to §3617.

### B. Trespass

Count II is a claim for trespass against all three defendants.

"The essentials of an action for trespass are: (1) ownership or possessory interest in land by the plaintiff; (2) invasion, intrusion, or entry by the defendant affecting the plaintiff's exclusive possessory interest; (3) done intentionally; and (4) causing direct injury." JMS Newberry, LLC v. Kaman Aerospace Corp., 149 Conn. App. 630, 641 (2014). "[A] person may be liable for causing someone else to commit a trespass. All persons who command, instigate, promote, encourage, advise, countenance, cooperate in, aid, or abet in the commission of a trespass, or who approve of it after it is done, if done for their benefit, are co-trespassers with the person committing the trespass, and are liable as principals to the same extent and in the same manner as if they had performed the wrongful act themselves." Mendez v. JPMorgan Chase Bank, N.A., No. Xo4HHDCV146049524S, 2016 WL 402008, *5 (Conn. Super. Ct., Jan. 8, 2016).

TMS and SLFS argue that there can be no claim for trespass because each had a right under the terms of the Open-End Mortgage Deed to enter Davis's property. But the terms of the mortgage did not give them an unfettered right to enter Davis's property. Here, the mortgage permitted only "reasonable entries upon and inspections of the Property," and Davis has alleged

facts that could establish that the entries and inspections were not reasonable.

> A contract must be construed to effectuate the intent of parties, which is determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction… [T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and … the language used must be accorded its common, natural, and ordinary meaning and usage where it can sensibly be applied to the subject matter of the [writing]…

Norboe v. Wells Fargo Bank, N.A., NNHCV 136038377, 2018 WL 1137575, *9 (Conn. Super. Ct., Jan. 31, 2018).

TMS argues that, in the event that Davis has stated a claim for trespass, it is not a proper defendant because neither TMS nor TMS employees entered the plaintiff's property. However, "the mere fact that the moving defendants did not themselves physically enter the property does not preclude a finding of liability for trespass." Mendez, at *5. A principal is vicariously liable for the acts of its agent committed during the course of that agency. An agency relationship exists if there is "an understanding between the parties that the principal will be in control of the undertaking [of the agent]." Wesley v. Schaller Subaru, Inc., 277 Conn. 526, 543-44 (2006). The court explained in Mendez:

> [W]hile it is true that our Supreme Court has recognized as a general rule that the employer is not liable for the negligence of its independent contractor when the employer lacks control over the manner in which the independent contractor did the

> work, <u>Pelletier v. Sordoni/Skanska Construction Co.</u>,
> 264 Conn. 509, 825 A.2d 72 (2003), it has also
> acknowledged that there are exceptions to this general
> rule when an employer retains control of or supervises
> the work. <u>Mozelski v. Thomas</u>, 76 Conn. App. 287, 818
> A.2d 1221 (2003).

<u>Mendez</u>, at *6. Also, "one who employs an independent contractor

to do work which the employer knows or has reason to know to be

likely to involve a trespass upon the land of another . . . is

subject to liability for harm resulting to others from such

trespass." <u>Halkiotis v. WMC Mortgage Corp.</u>, 144 F.Supp.3d 341,

364 (D. Conn. 2015) (citing Restatement (Second) of Torts

§427B).

Here, TMS contracted with SFLS, which in turn contracted

with MMC for MMC's employees to perform property inspections.

The plaintiff alleges that TMS retained control over the work

that MMC employees performed by issuing its set of requirements

and obligations to SFLS, which were in turn issued by SLFS to

MMC and its employees. In addition, the plaintiff alleges that

TMS had a duty under the CFPB Bulletin to supervise its

subcontractor's work. The plaintiff also alleges that even

though she lodged "regular complaints" with TMS, the intrusions

"continued every month." FAC ¶43.

TMS cites to <u>Jackson v. Bank of New York</u>, 62 F. Supp. 3d

802, 814 (N.D. I11. 2014) for the proposition that a mortgage

lender is not liable for trespass where claims are based on

actions of its agent's agents. However, the court noted in
Jackson that the determination of whether an entity is an agent
or an independent contractor is a "factually intensive one" that
is largely based on the level of control alleged. Id. at 814.
Here, Davis has alleged the requisite level of control.

Thus, the motions to dismiss are being denied with respect
to the claim for trespass.

### C. **Negligent Supervision**

Count III is a claim for negligent supervision against all
three defendants.

Negligent supervision claims contain the same elements as a
traditional negligence claim: duty, breach of that duty,
causation, and actual damages. See Murdock v. Croughwell, 268
Conn. 559, 566 (2004). "[A] common law duty of care arises when
(1) the defendant should have foreseen the likelihood of harm
occurring in the absence of due care, and (2) public policy
supports the imposition of legal responsibility." Norboe, at
*17. Restatement (Third) of Torts §61 provides for vicarious
liability under the following circumstances:

> An actor who hires an independent contractor for an
> activity is subject to vicarious liability for harm
> if: (a) the actor knows or should know that the
> activity is likely to involve a trespass, the creation
> of a public or private nuisance, or the withdrawal of
> lateral or subjacent support from the land of another;
> (b) the independent contractor's activity constitutes
> a trespass, constitutes a public or private nuisance,
> or withdraws lateral or subjacent support from the

land of another; and (c) the trespass, public or
private nuisance, or withdrawal of lateral or
subjacent support is a factual cause of any such harm
within the scope of liability.

Restatement (Third) Torts: Phys. & Emot. Harm §61 (2012).

Thus, a principal can be liable for the negligent
supervision of its non-employee agents and independent
contractors based on "improper performance of property
preservation activities/services more generally . . . including
the failure to prevent wrongful entries onto plaintiff's
property and into his home . . . , and the failure to adequately
instruct and monitor its agents[.]" Norboe at *17. So, while
"[a]s a general rule, 'an employer is not liable for the
negligence of its independent contractors[,]'" Pelletier v.
Sordoni/Skanks Const. Co., 264 Conn. 509, 517 (2003), there are
exceptions to this general rule.

Davis alleges that TMS, SLFS and MMC knew or should have
known that the property inspection services described in the
First Amended Complaint "involved an unreasonable risk of
causing emotional distress to [her]," which means they were
foreseeable. FAC ¶ 85. Davis also alleges that, "[g]iven such
factors as the sensitive nature of the work, including
intrusions upon seclusion and invasions of privacy such work
entails, Defendants' failure to properly supervise such
individuals could reasonably [lead] to situations where

-28-

homeowners suffered emotional injury as a result of such activities." Id. at ¶ 87. As to public policy supporting the imposition of legal responsibility, Davis alleges that TMS had an explicit duty to supervise SLFS and MMC based on the bulletin issued by the CFPB, which not only creates such a duty, but is also evidence that public policy supports a duty on the part of mortgage servicers like TMS to supervise its agents.

Davis also alleges that TMS, SLFS and MMC failed to adequately instruct and monitor their respective agents with respect to property inspection services. She alleges that each had a non-delegable duty to Davis to properly supervise its agents during the course of their performance of their duties, including entry into the homes of homeowners facing foreclosure, hiring and retention practices with respect to the individuals performing the work, and handling of complaints from customers like Davis regarding property inspection practices. See id. at ¶86 and ¶88.

It is not necessary for the court to reach the plaintiff's argument that the defendants can also be found liable under the "nondelegable duty" doctrine. See Norboe at *5 ("The nondelegable duty doctrine is invoked most frequently in premises-liability cases of one type or another . . . but there is no principled reason that its reach is limited to that context . . . It remains unclear at this time precisely how the

-29-

nondelegable duty doctrine would apply in the present context under Connecticut law.").

Thus, the motion to dismiss is being denied with respect to the claim for negligent supervision.

### D. **RESPA**

Count IV is a claim for violation of RESPA by TMS only based on how it responded to Davis's complaints about property inspections and how it handled Davis's qualified written request and notice of error.

Under RESPA, a person may submit a notice of error about the servicing of their loan. If any servicer of a federally related mortgage loan receives a notice of error or a qualified written request from the borrower for information relating to the servicing of such loan, the servicer must:

> [R]espond to a notice of error by either: (A) [c]orrecting the error or errors identified by the borrower and providing the borrower with a written notification of the correction, the effective date of the correction, and contact information, including a telephone number, for further assistance; or (B) [c]onducting a reasonable investigation and providing the borrower with a written notification that includes a statement that the servicer has determined that no error occurred, a statement of the reason or reasons for this determination, a statement of the borrower's right to request documents relied upon by the servicer in reaching its determination, information regarding how the borrower can request such documents, and contact information, including a telephone number, for further assistance.

12 C.F.R. 1024.35(e)(1)(i). A qualified written request is defined as follows:

> For purposes of this subsection, a qualified written
> request shall be a written correspondence, other than
> notice on a payment coupon or other payment medium
> supplied by the servicer, that – (i) includes, or
> otherwise enables the servicer to identify, the name
> and account of the borrower; and (ii) includes a
> statement of the reasons for the belief of the
> borrower, to the extent applicable, that the account
> is in error or provides sufficient detail to the
> servicer regarding other information sought by the
> borrower.

12 U.S.C. §2605(e)(1)(B). The failure to provide accurate information to a borrower regarding loss mitigation options and foreclosure, as required by 12 C.F.R. §1024.39, is a covered error under this section, as is any other error relating to the servicing of a borrower's mortgage loan. See 12 C.F.R. §§1024.35(b)(7) and (11). Where a plaintiff can establish a "pattern or practice of noncompliance" with RESPA, she may recover, in addition to actual damages, statutory damages in the amount of up to $2,000. 12 U.S.C. §2605(f)(1). This usually requires establishing that the defendant has a "standard or routine way of operating." Tanasi v. CitiMortgage, 257 F. Supp. 3d 233, 272 (D. Conn. 2017).

Davis alleges that she sent TMS a qualified written request and a notice of error on September 4, 2020. She alleges that "[i]n the request she specifically disputed the information TMS employees has given her regarding lump sum repayment requirements, and reiterated her request for a forbearance

pursuant to the CARES Act." FAC ¶ 66. She also alleges that her
"qualified written request . . . concerned a proper topic for
purposes of a notice of error under Regulation X because it
concerned TMS's 'failure to provide accurate information to a
borrower regarding loss mitigation options and foreclosure . .
.' and 'other error[s] relating to the servicing of a borrower's
mortgage loan.' 12 C.F.R. §1024.35(b)." FAC ¶ 67.  She then
alleges that "TMS ignored her request for a forbearance – i.e.,
failed to correct its error – and conducted no investigation nor
provided her with any response regarding the erroneous
information that TMS had provided her and she had disputed." FAC
¶ 68. Davis alleges that TMS violated RESPA and Regulation X
because of "the manner by which it responded to [her] complaints
about property inspections, and . . . the manner by which it
handled [her] qualified written request and notice of error."
Id. at ¶ 91.

    TMS argues that Davis's qualified written request did not
identify any error with respect to the servicing of her loan as
provided in 12 C.F.R. §1024.35 (b) because she merely complained
about TMS employees. RESPA defines the term "servicing" as
"receiving any scheduled periodic payments from a borrower
pursuant to the terms of any loan and making the payments of
principal and interest and such other payments with respect to
the amounts received from the borrower as may be required

pursuant to the terms of the loan." 12 U.S.C. §2605(i)(3).
Davis's qualified written request includes a complaint that TMS
employees gave her incorrect information about the workout
options available to her, and she requested a forbearance under
the CARES Act. Thus, her request involved the servicing of her
loan.

TMS's reliance on Canty v. Wells Fargo Bank, N.A., 463 F.
Supp. 3d 57, 65 (D. Mass 2020), is misplaced. Davis's notice of
error explicitly requested a CARES Act forbearance, which is a
loss mitigation option. Unlike the plaintiff in Canty, Davis was
not challenging the denial of a loan workout.

Under the Joint Statement cited by Davis and TMS, "Service
providers **must** provide a CARES Act forbearance if the borrower
makes this request and affirms that the borrower is experiencing
a financial hardship during the COVID-19 emergency. Servicers
**may not** require any additional information from the borrower
before granting a CARES Act forbearance." Consumer Financial
Protection Bureau, "Joint Statement on Supervisory and
Enforcement Practices Regarding the Mortgage Servicing Rules in
Response to the COVID-19 Emergency and the CARES Act", Apr. 3,
2020, https://www.fdic.gov/news/press-releases/2020/pr20047a.pdf
(emphasis in original). Because Davis had the option of
requesting a CARES Act forbearance, requested the forbearance
and advised TMS that the COVID-19 pandemic had adversely

-33-

affected her income, TMS was required to grant that request and its failure to do so is remediable under RESPA, even though the CARES Act provides neither an express nor an implied right of action.

TMS also argues its letter to Davis referring to a "COVID-19 related special forbearance plan" of 90 days, followed by either a lump sum payment or [a enter a workout plan], was adequate. But, as the plaintiff explains in her opposition, it was not accurate. As the plaintiff alleges, the CARES Act contemplates that a forbearance period of up to 180 days, renewable for up to 360 days, will be offered. See FAC ¶¶ 51, 53. TMS contends that, in any event, it provided an adequate response to Davis's request for information in her qualified written request. But, as explained by the plaintiff, while she did include a separate request for information in her qualified written request, TMS's response to the request for information is not the subject of her RESPA claim nor even explicitly referenced in her complaint.

Thus, the motions to dismiss are being denied with respect to the claim for a RESPA violation.

### E. **CUTPA**

#### 1. **Counts V and VI**

Count V is a CUTPA claim for unfair practices against TMS, SLFS and MMC, while Count VI is a CUTPA claim against TMS only for deceptive practices.

In order to state a claim under CUTPA, a plaintiff must allege facts that could establish "(1) the defendant engaged in unfair or deceptive acts or practices in the conduct of any trade or commerce, and (2) [the plaintiff] suffered an ascertainable loss of money or property as a result of the defendant's acts or practices." Artie's Autobody, Inc. v. Hartford Fire Ins. Co., 287 Conn. 208, 217 (2008).

The Connecticut Supreme Court has provided the following guidance for determining whether a practice is unfair:

> [W]e have adopted [certain] criteria set out in the cigarette rule by the [F]ederal [T]rade [C]ommission for determining when a practice is unfair: (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy, as it has been established by statutes, the common law, or otherwise- in other words, it is within at least the penumbra of some [common-law], statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [competitors, or other business persons]. . . . All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or to a lesser extent it meets all three[.]

Cenatiempo v. Bank of Am., N.A., 333 Conn. 769, 790 (2019). "[N]ot . . . every consumer injury is legally unfair . . . . To justify a finding of unfairness the injury must satisfy three

-35-

tests. It must be substantial; it must not be outweighed by any countervailing benefits to consumers or competition that the practice produces; and it must be an injury that consumers themselves could not reasonably have avoided." Id. at 802 (quoting McLaughlin Ford, Inc. v. Ford Motor Co., 192 Conn. 558, 569-70 (1984)).

A practice is deceptive if each of the following is true: "First, there must be a representation, omission, or other practice likely to mislead consumers. Second, the consumers must interpret the message reasonably under the circumstances. Third, the misleading representation, omission, or practice must be material—that is, likely to affect the consumer's decisions or conduct." Caldor, Inc. v. Helson, 215 Conn. 590, 597 (1990).

TMS and SLFS argue that the CUTPA claims must be dismissed because they rely on other meritless claims. However, the CUTPA claims are based on both conduct that is covered by Davis's other claims and conduct that is not covered by those other claims, and in any event, most of those other claims survive the motions to dismiss. See Cenatiempo, 333 Conn. at 791-92 (conscious decision by mortgage servicer to depart from federally-established industry norms violated CUTPA); Norboe at *15 (CUTPA prohibits "pattern of disregard and even indifference with respect to fundamental rights of privacy and homeownership protected by well-established public policy.").

Applying the cigarette rule to the claim of unfairness, Davis only needed to satisfy one prong, but the First Amended Complaint satisfies all three. With respect to the first prong, Davis alleged that the conduct of TMS and SLFS in repeatedly unreasonably intruding on her property and subjecting her to discriminatory treatment while refusing to change or to entertain her requests for scheduled inspections, their failure to train and supervise their employees and agents and failure to comply with federal laws and the CFPB bulletin, and TMS's conduct in ignoring its servicing obligations under the CARES Act, the FHA and RESPA all contravened public policy, including federal law and public policy regarding the sanctity of one's home.

With respect to the second prong, the First Amended Complaint alleges that the defendants' acts were "immoral, unscrupulous, unethical, and oppressive" because they subjected a Black woman to racist remarks because of her race and they disregarded her complaints and requests for loss mitigation. FAC ¶ 100.

The First Amended Complaint also satisfies the third prong by alleging substantial injury to Davis and other consumers like her, which could not have reasonably been avoided. Davis alleges that she no longer feels safe in her own home because of the conduct of the defendants, that she was charged improper fees in

connection with and interest on her loan, that she lost the
opportunity to obtain a loan workout, and that she suffered
damage to her property. The factual allegations in the First
Amended Complaint support a reasonable inference that the
defendants' failure to follow appropriate policies and
procedures with regard to complaints not only impacts Davis, but
also other borrowers too. Among other things, she alleges that
TMS has treated several other customers the way she has been
treated. In addition, the First Amended Complaint alleges that
the injury the conduct produced was not outweighed by any
countervailing benefits to Davis or consumers like her.

Finally, the First Amended Complaint alleges facts showing
that the conduct causing Davis substantial injury reasonably
could not have been avoided by her. While Davis could have
avoided the injury if she had not defaulted on her loan, as the
court observed in Cenatiempo, "that is the case in every
situation involving a modification process for a financially
troubled borrower." 333 Conn. at 790.

TMS does not assert an independent challenge to the
sufficiency of the claim of deceptive practices. In any event,
the First Amended Complaint alleges that TMS made misleading
representations and omitted information about a forbearance
under the CARES Act, and as a result, Davis suffered damages,

including improper fees and interest, and loss of an opportunity to obtain a loan workout.

TMS and SLFS argue that Davis fails to allege that she suffered an ascertainable loss, which is necessary to state a claim under CUTPA. As ascertainable loss is:

> [A] loss that is capable of being discovered, observed, or established… The term loss necessarily encompasses a broader meaning than the term damage, and has been held synonymous with deprivation, detriment, and injury. . . . To establish an ascertainable loss, a plaintiff is not required to prove actual damages of a specific dollar amount. . . . [A] loss is ascertainable if it is measurable even though the precise amount of the loss is not known.

Di Teresi v. Stamford Health System, Inc., 149 Conn. App. 502, 508 (2014).

The First Amended Complaint alleges that TMS paid SLFS for each task completed on its behalf, and then that amount was charged to Davis. Because Davis was charged for the inspections, she suffered a measurable loss. Davis also alleges that agents of the defendants damaged her garage door, and that during a forbearance period servicers charge borrowers fewer fees than when they are not in forbearance. In both instances, the allegation reflects an ascertainable loss.

Thus, the motions to dismiss are being denied with respect to the CUTPA violations claimed in Count V and Count VI.

### 2. **Count VII**

Count VII is a claim that TMS's violations of CUTPA were intentional and wanton violations of the plaintiff's rights or committed with reckless indifference to her rights.

"Once a CUTPA violation has been established, evidence that a defendant has acted with reckless indifference to the rights of the plaintiff or has committed an intentional and wanton violation of those rights is a necessary prerequisite to the award of punitive damages." Whitaker v. Taylor, 99 Conn. App. 719, 733 (2007).

As discussed above, the factual allegations in the First Amended Complaint are sufficient to establish that TMS violated CUTPA. Davis alleges that "TMS has acted with reckless indifference" to her rights, and that "TMS's actions and failures to act exhibited a blatant disregard for [her] well-being." FAC ¶ 109-10. TMS argues that, assuming that it inadvertently provided Davis with incorrect information about rapidly changing CARES Act regulations, such errors would not rise to the level of reckless indifference. But Davis alleges that she repeatedly requested a forbearance from TMS pursuant to the CARES Act, that TMS refused to provide her with one each time, and that TMS repeatedly gave her incorrect information about her options with respect to a forbearance. Davis also alleges that as a result of TMS's failure to give her a forbearance, she faces the loss of opportunity to keep her home

and a potential foreclosure. Davis's allegations that TMS, knowing of the potential consequences that she faced, continued to deny her request for a forbearance and failed to conduct adequate investigations into her complaints rises to the level of at least reckless indifference.

Thus, the motion to dismiss is being denied with respect to Count VII.

### F. **Motion, in the Alternate, To Stay this Action**

TMS requests, in the alternative, that this action be stayed pending resolution of the foreclosure action that was pending in Connecticut Superior Court when this case was filed.

TMS argues that this case should be stayed under the prior pending action doctrine. Under the prior pending action doctrine, "where there are two competing lawsuits, the first should have priority, absent the showing of balance of convenience in favor of the second action, or unless there are special circumstances which justify giving priority to the second." Cupe v. Lantz, 470 F. Supp. 2d 128, 132 (D. Conn. 2007). But this doctrine is applicable only where there are two similar actions pending at the same time in two federal courts, not where one of the two actions is in state court, as is the situation here. "Where, as here, the prior pending action is a state court action, 'the more appropriate analysis is one of

abstention, pursuant to <u>Colorado River</u>.'" <u>AM Broadband, LLC v.</u>
<u>First Financial Ins. Co.</u>, No. 3:08-cv-378 (CFD), 2009 WL 353493,
at *2 (D. Conn. Feb. 10, 2009).

TMS appears to also argue that abstention is appropriate.
The Supreme Court stated that "[a]bstention from the exercise of
federal jurisdiction is the exception, not the rule." <u>Colorado</u>
<u>River Conservation Dist. v. United </u>States, 424 U.S. 800, 813
(1976). "Generally, as between state and federal courts, the
rule is that 'the pendency of an action in the state court is no
bar to the proceedings concerning the same matter in the Federal
court having jurisdiction. . . '" <u>Id.</u> at 817 (citation omitted).
This is because of the "virtually unflagging obligation of the
federal courts to exercise the jurisdiction given to them." <u>Id.</u>

"<u>Colorado River</u>, however, permits 'an extraordinary and
narrow exception' when there are contemporaneous parallel
proceedings in state court and abstention would serve 'wise
judicial administration, giving regard to conservation of
judicial resources and comprehensive disposition of
litigation.'" <u>Martino v. Seterus, Inc.</u>, 2018 WL 3553406, at *3
(D. Conn. July 23, 2018). "In order for abstention under
<u>Colorado River</u> to be justified, courts must first determine that
the concurrent proceedings in state and federal court are
parallel." <u>Id.</u>

> As stated above, "[s]uits are parallel when
> substantially the same parties are contemporaneously
> litigating substantially the same issues in another
> forum." Dittmer, 146 F.3d at 118. "In determining
> whether two actions are parallel for purposes of
> Colorado River abstention, 'a court may consider
> whether the actions involve the same (i) parties, (ii)
> subject matter, and (iii) relief requested.'" Gov't
> Emplotees Ins. Co. v. Leica Supply, Inc., No. 11-CV-
> 3781 (KAM)(VVP) 2014 WL 1311544, at *4 (E.D.N.Y. Mar.
> 28, 2014)(citation omitted); see National Union Fire
> Ins. Co of Pittsburgh, PA v. Karp, 108 F.3d 17, 22 (2d
> Cir. 1997)("Federal and state proceedings are
> 'concurrent' or 'parallel' for purposes of abstention
> when the two proceedings are essentially the same;
> that is, there is an identity of parties, and the
> issues and relief sought are the same.").

Id. at *4.

Here, the parties in the state court action and this action are not identical. SLFS and MMC are present in this action but not the state court action, but they both acted as agents of TMS and contracted with one another with respect to the servicing of the mortgage. Therefore, the parties in both cases are substantially the same for purposes of this analysis.

As to the question of whether the issues and relief are substantially the same, "[l]anguage in Telesco v. Telesco appears to indicate that the Second Circuit, in determining whether proceedings are parallel, is willing to consider whether the state proceeding could be amended or modified to include omitted claims raised before the federal court." Martino, 2018 WL 3553406, at *6 (citing Telesco v. Telesco Fuel & Masons'

Materials, Inc., 765 F.2d 356, 362-63 (2d Cir. 1985). In Martino,

the court also explained:

> It appears to the court that the holding in Telesco
> could be read in two different ways. Read broadly,
> Telesco could be interpreted as holding that courts
> should "consider how the state proceedings could have
> been brought in theory, i.e., what claims and parties
> could have been included had the federal plaintiff
> made a timely application to do so, and compare the
> theoretical state proceedings to the federal
> proceedings." Fox v. Maulding, 16 F.3d 1079, 1081 (10th
> Cir.1994)(citing, and subsequently disagreeing with,
> Telesco). Read narrowly, however, Telesco could be
> interpreted as merely holding that a new legal theory
> that is essentially the same as a cause of action
> already raised in the state case is not sufficient to
> defeat the parallel nature of proceedings. See Garcia
> v. Tamir, No. 99 CIV. 0298 (LAP), 1999 WL 587902, at
> *3 (S.D.N.Y. Aug. 4, 1999). The narrow reading would
> still require essentially the same cause of action to
> be actually raised in the state case.

Martino, 2018 WL 3553406, at *6.

As was the case in Martino, this court need not resolve the

question of how to read Telesco because abstention is not

warranted under either reading. Under the narrow reading, there

is no cause of action in the state foreclosure case with

essentially the elements of Davis's claims here because Davis

does not assert any counterclaims in the foreclosure action.

The proceedings are not parallel under the broad reading of

Telesco either because Davis could not bring her claims here as

counterclaims in the foreclosure action. "Connecticut law

'narrowly circumscribes the special defenses and counterclaims

that may be raised in foreclosure actions to those that relate

to the 'making, validity, or enforcement of the note or
mortgage,' with limited exceptions.'" Id. at *7 (quoting Bailey
v. Interbay Funding, LLC, No. 3:17-CV-1457 (JCH), 2018 WL
1660553, at *10 (D. Conn. Apr. 4, 2018)). A counterclaim, unlike
a special defense, must have a "reasonable nexus to, but need
not directly attack, the making, validity, or enforcement of the
mortgage or note." Id. "When the counterclaims allege that the
foreclosure-plaintiff's actions led the foreclosure defendant to
default, Connecticut courts have allowed those counterclaims as
related to the enforcement of the mortgage." Id. "On the other
hand, when the counterclaims only allege conduct during post-
default mediation and loan modification negotiations,
Connecticut courts have struck these counterclaims as lacking a
sufficient nexus to the enforcement of the mortgage." Id.

Applying these rules to this case, this action is not
parallel to the state court action. Davis's claims in this
action are all related to the defendants' conduct after she
defaulted on her mortgage. Consequently, they lack a sufficient
nexus to the enforcement of the mortgage and may not be raised
as counterclaims in the foreclosure action.

Because the proceedings are not parallel, abstention under
Colorado River is not justified, so the motion, in the
alternative, to stay this case pending resolution of the state
foreclosure action is being denied.

**IV.   CONCLUSION**

For the reasons set forth above, The Money Source Inc.'s Motion to Dismiss Plaintiff's First Amended Complaint (ECF No. 40) and Service Field Services, LLC's Motion to Dismiss (ECF No. 41) are hereby GRANTED in part and DENIED in part. The part of Count I that is based on 42 U.S.C. § 3604(c) is dismissed, and the motions are otherwise denied.


It is so ordered.

Signed this 30th day of August 2021 at Hartford, Connecticut.



                                    /s/ AWT
                             _____
                                Alvin W. Thompson
                             United States District Judge